The BLACK PANTHER PARTY, et al., Appellants,

v.

William French SMITH, Attorney General of the United States, et al.

No. 80–1302.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 13, 1981.

Decided July 8, 1981.

Bruce J. Terris, Washington, D. C., with whom Susan B. Drake, Washington, D. C., was on the brief, for appellants.

Larry L. Gregg, Atty., Dept. of Justice, Washington, D. C., with whom Alice Daniel, Asst. Atty. Gen., Washington, D. C., at the time the brief was filed, Thomas S. Martin, Acting Asst. Atty. Gen., Washington, D. C., at the time the brief was filed, and Barbara H. Herwig and R. Joseph Sher, Attys., Dept. of Justice, Washington, D. C., were on the brief, for all appellees except George C. Moore and William C. Sullivan.

William L. Stauffer, Jr., Washington, D. C., for appellee George C. Moore.

Bennett Boskey, Washington, D. C., entered an appearance for appellee Edward Levi.

Before WRIGHT, MACKINNON, and GINSBURG, Circuit Judges.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

Opinion concurring in part and dissenting in part filed by Circuit Judge MACKINNON.

J. SKELLY WRIGHT, Circuit Judge:

In this appeal we confront a number of issues relating to pretrial procedure, including the important question whether civil litigants may refuse to respond to interrogatories on the ground of constitutional privilege. The case began when the Black Panther Party (the Party), Huey P. Newton, and other individuals sued the United States and various government officials, alleging that they had unlawfully conspired to destroy the Party.[1] After presiding over several years of bitterly fought discovery battles, the District Court granted a government motion to dismiss the Party's action.[2] It reasoned that dismissal was appropriate because the Party had: (1) unjustifiably claimed a First Amendment privilege and refused to answer several interrogatories that would have required it to reveal the names of Party members whose names were not known to the public; (2) failed to clarify answers to interrogatories that the District Court believed to be inconsistent or evasive; and (3) disobeyed a discovery order requiring individual Party officers to respond to interrogatories originally served on the Party itself.[3] The District

---

1. See Amended Complaint, reprinted at Joint Appendix (JA) 24–53.

2. See Memorandum and Order of January 25, 1980, reprinted at JA 1131.

3. See id. at JA 1132–1134, 1136.

Court also dismissed Huey Newton, ruling that he had improperly asserted the Fifth Amendment privilege against self-incrimination when he refused to answer several interrogatories.[4] Finally, it dismissed all other plaintiffs.[5]

The Party, Newton, and the other plaintiffs now challenge these dismissals. They also appeal the District Court's decision to award to appellees the costs and attorney fees incurred in bringing the motion to dismiss,[6] the decision to grant summary judgment in favor of government officials who held office after 1973,[7] and the decision to deny a motion for an extension of time in which to file for class action certification.[8] For the reasons stated below, we reverse the dismissals, the decision to award attorney fees and costs, and the decision to grant summary judgment. We affirm the denial of the motion for an extension of time in which to file for class certification. The case is remanded for further proceedings consistent with our decision.

**4.** *See id.* at JA 1135–1136.

**5.** *See* Amended Order and Final Judgment of February 13, 1980, *reprinted at* JA 1144.

**6.** *See* Memorandum and Order of January 25, 1980, JA 1131, 1136–1137.

**7.** *See* Order of July 27, 1978, *reprinted at* JA 253.

**8.** *See* Order of May 26, 1977, *reprinted at* JA 56. The Party, Newton, and the other plaintiffs below also challenge the District Court's decision to postpone consideration of their motion to compel production of documents by appellees until after it had considered appellees' motion to compel further responses to interrogatories. *See* Transcript of Proceedings, Hearing of November 22, 1978, *reprinted at* JA 609, 626–627. As we explain below, *see* Part VI–C *infra*, we need not reach this issue.

**9.** These individuals include Party supporters Donald Freed, Berton Schneider, Thomas and Flora Gladwin, John George, and Father Earl Neil. John and Elizabeth Huggins, who sued on behalf of their son, deceased Party member John Huggins, are also appellants. Elaine Brown, who was Party chairperson at the time the suit was filed, was a plaintiff below but has not joined this appeal. *See* appellants' brief at 3; Amended Complaint at JA 27–28.

**10.** *See id.* at JA 31–33, 51–53. The Party, Huey Newton, Elaine Brown, and John and Elizabeth

## I. BACKGROUND

### A. *The Complaint*

Plaintiffs-appellants are the Party, Newton, the Party's founder, and various other Party members and supporters.[9] In December 1976 they filed a complaint seeking declaratory and injunctive relief on behalf of themselves and two classes: all individuals who had been or continued to be members of the Party, and all individuals who had provided political or financial assistance to the Party.[10] The Party and Newton also sought money damages.[11] Defendants-appellees are the United States and various government officials, including past and present Directors of the Central Intelligence Agency and the Federal Bureau of Investigation, Attorneys General, Secretaries of the Treasury, Postmasters General, and Commissioners of the Internal Revenue Service.[12] Present officials were sued in their official and individual capacities.

Huggins, *see* note 9 *supra*, sought to represent the class of past and present Party members. Donald Freed, Berton Schneider, Thomas and Flora Gladwin, John George, and Father Neil, *see* note 9 *supra*, sought to represent the class of past and present Party supporters.

**11.** *See* Amended Complaint at JA 53. Elaine Brown also asked for money damages.

**12.** The defendants-appellees include the present Attorney General and former Attorneys General Benjamin Civiletti, Griffin Bell, Edward Levi, and John Mitchell; former Assistant Attorney General for Internal Security Robert Mardian; present FBI Director William Webster and past FBI Director Clarence Kelley; past Assistant Director of the FBI William Sullivan; past Chief of the Racial Intelligence Section of the FBI George Moore; the present CIA Director Stansfield Turner and past Directors George Bush, William Colby, and Richard Helms; the present Secretary of the Treasury and past Secretaries G. William Miller, W. Michael Blumenthal, and William Simon; the present Director of the Bureau of Alcohol, Tobacco & Firearms of the Treasury Department and past Directors Rex Davis and Harold Serr; the present IRS Commissioner and past Commissioners William Williams, Donald Alexander, Randolph Thrower, and Johnnie Walters; past Secretaries of the Army Clifford Alexander and Howard Calloway; Assistant Chief of Staff for Army Intelligence Harold R. Aaron; the present Postmaster General and past Post-

Past government officials were sued only in their individual capacities.[13]

In their complaint appellants alleged that since 1968 the appellees and other unknown government employees had engaged in a continuing conspiracy to destroy the Black Panther Party, in violation of the Constitution and various statutes.[14] They stated that they first learned of the existence of this conspiracy in 1976, when the Senate Select Committee to Study Government Operations with Respect to Intelligence Activities published a report entitled *Intelligence Activities and the Rights of Americans*, S.Rep. No. 755, 94th Cong., 2d Sess., Books II and III (Senate Report).[15] According to appellants, this report reveals that the FBI formed a special counterintelligence program called COINTELPRO primarily to "expose, disrupt, misdirect, discredit or otherwise neutralize the activities of black nationalists."[16] Appellants suggested that through this program the FBI orchestrated efforts to undermine the Party.[17]

Appellants conceded that they lacked specific details about the nature and scope of the conspiracy against the Party; they stated that they hoped to obtain further infor-

mation through use of discovery.[18] Relying in part on information provided in the Senate Report, however, they were able to allege a number of specific activities.[19] They complained of unlawful mail openings, warrantless wiretaps and break-ins, and burglaries.[20] Appellants contended that the government, with the assistance of local law enforcement agencies, harassed and even assassinated Party officers, members, and supporters.[21] They further suggested that appellees had incited dissension within the Party through use of anonymous letters, paid informants, and *agents provocateurs*.[22] They alleged that appellees also instigated violent confrontations between the Black Panthers and other black organizations.[23] Finally, they claimed that appellees deterred contributions to the Party, crippled the Party newspaper, *The Black Panther*, discouraged press coverage of Party activities, and sabotaged the Party's public service programs.[24]

At the conclusion of their complaint appellants asked the District Court to enter a declaratory judgment finding that appellees had violated their constitutional and statu-

masters General Benjamin Bailar and William Blount; and past Assistant to the President Tom Charles Houston. *See* appellees' brief at viii; Amended Complaint at JA 29–30. Also named as defendants below were unnamed employees of the Department of Justice, the FBI, the CIA, the Treasury Department, the Executive Office of the President, the Department of the Army, the Postal Service, and other federal agencies that took part in the alleged conspiracy. *See id.* at JA 30–31.

13. *See id.* at JA 31.

14. In particular, they claim that appellees have violated the Fourth, Fifth, and Ninth Amendments to the Constitution, the Civil Rights Act, 42 U.S.C. § 1985 (1976), the National Security Act of 1947, 50 U.S.C. § 403 (1976), the Internal Revenue Act, 26 U.S.C. § 7605 (1976), the Postal Service Act, 39 U.S.C. § 403 (1976), and the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (1976), 47 U.S.C. § 605 (1976). *See* Amended Complaint at JA 26.

15. *See id.* at JA 33–36; appellants' brief at 5.

16. *See* Amended Complaint at JA 33.

17. *Id.* at JA 33–34.

18. *Id.* at JA 35.

19. *Id.* More specifically, appellants seem to have based their complaint primarily on information contained in two chapters of this report. The first, entitled "COINTELPRO: The FBI's Covert Action Programs Against American Citizens," S.Rep. No. 755, 94th Cong., 2d Sess., Book III, at 1–77 (Senate Report), describes the FBI's counterintelligence programs in general terms. The second, entitled "The FBI's Covert Action Program to Destroy the Black Panther Party," *id.* at 185–223, focuses on the actions taken against the Party. Appellants also stated that they learned of various actions through independent sources. *See* Amended Complaint at JA 36.

20. *See id.* at JA 37.

21. *Id.* at JA 37–41, 47–49.

22. *Id.* at JA 42–43.

23. *Id.* at JA 39–41.

24. *Id.* at JA 43–47.

tory rights. They also requested that appellees be enjoined from taking any further action to undermine the Party or harm its members and supporters. The Party and Newton each asked for $50 million in compensatory damages and $50 million in punitive damages.[25]

## B. *Proceedings Below*

Discovery battles and other pretrial disputes consumed almost three years.[26] On May 26, 1977 the District Court denied appellees' motions to dismiss and directed the action to proceed to discovery. It also denied appellants' motion for an extension of time in which to move for class action certification, invoking Local Rule 1–13(b), Rules of the United States District Court for the District of Columbia.[27] Local Rule 1–13(b) provides that motions for class action certification must be made within 90 days of the filing of the complaint.[28] Appellants filed a request for production of documents during the same month. They withdrew this request shortly thereafter in favor of a second request.[29] Later, after appellees complained about the breadth of the second request and moved for a protective order,

appellants filed a superseding third request.[30] At the same time the parties agreed that discovery would take place in "waves." During the initial wave they planned to limit their discovery to requests for documents and interrogatories; they would have an opportunity to take depositions during subsequent waves.[31]

In July 1977, before initiating any discovery, the government officials who had held office after 1973 moved for summary judgment on the ground that they could not have been involved in any of the acts alleged. They filed affidavits setting forth the dates on which they assumed office and disclaiming any knowledge of or participation in a conspiracy against appellants.[32] Appellants responded with an affidavit of counsel under Rule 56(f) of the Federal Rules of Civil Procedure, stating that they needed further discovery before they could respond to appellees' motion for summary judgment.[33] They also noted that the affidavits of three of the post-1973 officials, former Postmaster General Benjamin Bailar, former Attorney General Edward Levi, and former Internal Revenue Service Com-

---

25. *Id.* at JA 51–53. Elaine Brown also requested $50 million in compensatory and $50 million in punitive damages. As we noted earlier, Elaine Brown is not participating in this appeal. *See* note 9 *supra.*

26. Appellants filed their complaint on December 1, 1976. All appellants were finally dismissed on February 14, 1980. *See* Docket of Proceedings, *reprinted at* JA 1.

27. *See* Order of May 26, 1977 at JA 56.

28. Local Rule 1–13(b) states, in pertinent part:
 Within 90 days after the filing of a complaint in a case sought to be maintained as a class action, the plaintiff shall move for a certification under Rule 23(c)(1), Federal Rules of Civil Procedure, that the case may be maintained as a class action. * * *

29. *See* appellants' brief at 10; appellees' brief at 4–5; *see also* First Request by Plaintiffs for Production of Documents, May 20, 1977, Record (R) 30.

30. *See* Motion by Defendants for a Protective Order, July 14, 1977, R 55; Third Request by Plaintiffs to Defendants for Production of Documents, November 3, 1977, R 85. In their third request appellants asked the FBI, the CIA, the

Treasury Department (including the IRS and the Bureau of Alcohol, Tobacco & Firearms), the Department of the Army, and the United States Postal Service to produce a variety of documents pertaining to the Black Panther Party or to Huey Newton.

31. *See* Stipulation of November 15, 1977, R 89.

32. *See* Motion by Defendants Griffin Bell, W. Michael Blumenthal, Clifford Alexander, Stansfield Turner, Benjamin Bailar, Edward Levi, George Bush, William Simon, and William Williams for Summary Judgment, July 14, 1977, R 56.

33. *See* Affidavit Pursuant to Rule 56(f) of Bruce J. Terris, Attorney for Plaintiffs, R 71. Rule 56(f) provides:
 Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

missioner William Williams, raised new issues of material fact, since they seemed to concede involvement in investigations of the Black Panther Party. Finally, appellants noted that their complaint alleged a continuing conspiracy, and that at least one overt act had occurred after 1973.[34] The District Court decided to grant this motion in July 1978, observing that the officials' affidavits supported their claims of noninvolvement, and that appellants had failed to file an evidentiary submission of their own, even though they had been given "ample opportunity" to take discovery since filing their affidavit of counsel.[35]

Appellees served 244 interrogatories on the Party on January 31, 1978. Three months later they served 82 interrogatories on Huey Newton.[36] On June 12, 1978 appellees moved to dismiss the Party and Newton under Rule 37(d), Federal Rules of Civil Procedure, because their responses to the interrogatories were late. Appellants responded by stating that answers would be filed by July 24. Answers were actually provided on July 27, 1978.[37] The Party's answers, which were prepared by one of its officers, Joan Kelley, were more than 100 pages in length.[38] It refused to answer several interrogatories that would have required it to reveal the names of Party members whose identities were not known to the public, claiming that the information was privileged under the First Amendment.[39] It also objected to a number of interrogatories on the ground that they were unduly burdensome.[40] When the information requested in an interrogatory could be obtained from the Party's newspaper, *The Black Panther*, the responses simply referred appellees to that publication.[41] Newton's answers were 22 pages in length.[42] He asserted the Fifth Amendment privilege against self-incrimination with respect to 32 of the interrogatories, claiming that they would have required him to disclose information concerning events that were the subject of pending criminal prosecutions or criminal and civil investigations.[43]

34. *See* Memorandum of Points and Authorities in Opposition to Motion of Certain Defendants for Summary Judgment, R 71 at 9–17.

35. *See* Order of July 27, 1978, JA 253–254.

36. *See* Federal Defendants' First Interrogatories to Plaintiff Black Panther Party, January 31, 1978, R 105; Federal Defendants' First Interrogatories to Plaintiff Huey P. Newton, April 18, 1978, R 139. Appellees also requested documents from the Party and Newton. *See* Response of Plaintiff Black Panther Party to Federal Defendants' First Request for Production of Documents, July 24, 1978, *reprinted at* JA 215; Response of Plaintiff Huey P. Newton to Federal Defendants' First Request for Production of Documents, July 24, 1978, *reprinted at* JA 215; Response of Plaintiff Huey P. Newton to Federal Defendants' First Request for Production of Documents, July 24, 1977, *reprinted at* JA 251. In addition, interrogatories were served on the other plaintiffs. *See* Federal Defendants' Interrogatories to Plaintiffs Schneider, Neil, Gladwin, Freed, Huggins, and George, June 12, 1978, R 146. Neither the document requests nor the interrogatories served on the other plaintiffs are at issue here. Defendant-appellee George Moore, former Chief of the Racial Intelligence Division of the FBI, served separate sets of interrogatories on the Party and Newton. *See* Defendant George Moore's Interrogatories to Plaintiffs, August 29, 1977, R 69. Moore also made other discovery requests.

*See generally* Docket of Proceedings, JA 1–15. None of Moore's requests is at issue here.

37. *See* appellees' brief at 6; Docket of Proceedings, JA 13–14. Rule 37(d) provides that if a party fails to serve answers to interrogatories, the court "may make such orders in regard to the failure as are just," including orders that dismiss the action or any part thereof.

38. *See* Plaintiff Black Panther Party's Responses to Interrogatories of the Federal Defendants (Party's Original Responses), *reprinted at* JA 82–211.

39. *See* Plaintiff Black Panther Party's Objections to the Interrogatories of the Federal Defendants, *reprinted at* JA 212–214.

40. *See, e.g., id.* at JA 99, 108 (responses to Interrogatories 25 and 33); *see also id.* at JA 83.

41. *See, e.g., id.* at JA 110 (responses to Interrogatories 37, 38); *see also id.* at JA 82–83.

42. *See* Plaintiff Huey P. Newton's Answers to First Interrogatories of Federal Defendants, *reprinted at* JA 218–240.

43. *See* Objections of Plaintiff Huey P. Newton to First Interrogatories of Federal Defendants, *reprinted at* JA 240–251.

On September 21, 1978 appellants filed a motion under Rule 37(a) of the Federal Rules of Civil Procedure to compel production of documents by appellees. Appellants began by noting that the materials they had received were highly disorganized. They stated that the documents were provided in random order in unlabeled boxes, that the CIA did not even keep pages of single documents together, and that only the IRS provided an index. Appellants went on to claim that appellees had failed to produce a number of requested documents without stating any objections to production. They suggested that appellees were deliberately concealing the existence of relevant material. Appellants also argued that even where appellees had stated objections to production of certain documents, their objections were improper.[44]

The next day appellees renewed their earlier motion under Rule 37(d) to impose the sanction of dismissal. They asserted that neither the Party nor Newton could refuse to answer interrogatories on the ground of constitutional privilege. They objected to the Party's claim that several of the interrogatories were overly burdensome. They also suggested that Joan Kelley, who prepared the Party's responses, was not a proper representative since she had only been a Party officer since 1971 and thus did not have firsthand knowledge of many of the events referred to in the complaint. Finally, they contended that many of the Party's responses were incomplete, evasive, or inconsistent.[45] Appellants objected to the filing of this motion as a motion for sanctions, contending that it should have been filed as a motion to compel.[46]

In November 1978 the District Court stated that it would consider appellees' motion to dismiss first, because that motion was "potentially dispositive" of the case. Consideration of appellants' motion to compel discovery was indefinitely postponed.[47] Shortly thereafter the court heard argument on the question whether appellees were entitled to file a motion for sanctions, or whether they were first required to file a motion to compel discovery. It agreed with appellants, and ruled that the motion to dismiss should have been filed as a motion to compel discovery under Rule 37(a).[48] Appellees complied with this ruling in late December 1978. In their new motion to compel they raised the same objections that they had raised in their earlier motion to dismiss.[49]

The Party responded to appellees' motion to compel with two lengthy memoranda, large portions of which endeavored to explain the apparent inconsistencies in the

---

44. *See* Motion for Order Under Rule 37 Compelling Discovery by Federal Defendants, *reprinted at* JA 255; Memorandum of Points and Authorities in Support of Plaintiffs' Motion to Compel Discovery by Federal Defendants, *reprinted at* JA 256–313. Rule 37(a) provides that if "a party fails to answer an interrogatory submitted under Rule 33," the proponent of the question may "move for an order compelling an answer." Rule 37(a), Fed.R.Civ.P.

45. *See* Supplemental Memorandum of Points and Authorities in Support of the Motion of Defendants for Sanctions for Failure to Provide Discovery, *reprinted at* JA 518–562.

46. *See* appellants' brief at 11; *see also* note 48 *infra*.

47. *See* Transcript of Proceedings, Hearing of November 22, 1978, *reprinted at* JA 626–627.

48. *See* Transcript of Proceedings, Hearing of December 14, 1978, *reprinted at* JA 629, 659.

Appellants argued that sanctions may be imposed under Rule 37(d) only when there has been a complete failure to answer. Here, however, answers had been filed. Thus appellees were first required to move for an order compelling discovery under Rule 37(a). If appellants refused to obey this order, then sanctions could be sought under Rule 37(b), which provides that if a party refuses to obey an order made under Rule 37(a), the court may "make such orders in regard to the [refusal] as are just * * *." *See id.* at JA 642–652. The District Court apparently accepted this argument. It continued to give priority to appellees' motion, however. *See generally* Part III–C *infra* (describing scheme set forth in Rule 37).

49. *See* Defendants' Motion to Compel Discovery, R 202; Statement of Defendants Bell et al: Interrogatories Sought to be Compelled, *reprinted at* JA 775–829.

Party's original responses.[50] The Party also voluntarily supplemented many of the responses to which appellees objected.[51] Joan Kelley provided an affidavit in which she detailed the extent of her search and her qualifications to act as the Party's representative.[52] Huey Newton filed a 35-page memorandum and an affidavit describing his own efforts to respond. Like the Party, he also voluntarily supplemented several of his responses.[53]

On August 6, 1979 the District Court issued an order and an accompanying memorandum in which it granted appellees' motion to compel further responses by the Party and Newton.[54] It ruled that the Party must answer the interrogatories with respect to which it had claimed a First Amendment privilege, reasoning that "[p]laintiff cannot assert this privilege and at the same time proceed with this lawsuit, withholding information vital to the defense of the parties sued."[55] The court also held that the Party must supplement responses to 44 interrogatories that appellees had alleged to be inconsistent or evasive.[56] The District Court further ruled that each of the Party's officers should provide supplemental responses to 107 interrogatories. It conceded that Joan Kelley, the Party, and its attorneys had made "a good faith effort to provide full and complete an-

swers," but reasoned that such an order was nonetheless appropriate because of "1) the scarcity of records, 2) the time lapse between the alleged occurrences and the present and 3) the scattering and possible unavailability of many witnesses."[57] Finally, the court ruled that where the Party did not provide specific information, but simply referred to *The Black Panther*, it should provide supplemental responses based upon a full and complete review of that publication.[58]

As for Newton, the court held that he must answer the 32 interrogatories with respect to which he had claimed a Fifth Amendment privilege. The court stated:

[D]efendants contend that the withheld information is vital to their defense, many times to the point of telling them what exactly they are accused of doing. Therefore, if plaintiff Newton is to proceed with this lawsuit * * * he must answer * * *. This Court is not compelling plaintiff Newton to waive any privileges he may have, but is merely leaving the choice to Mr. Newton, as a plaintiff, whether he wishes to continue to press claims relating to these interrogatories.

Joint Appendix (JA) 856. The court also ordered Newton to supplement his answers to five other interrogatories.[59]

---

50. *See* Plaintiff Black Panther Party Memorandum of Points and Authorities in Response to Motion to Compel Discovery, *reprinted in part at* JA 692–727; Statement of Plaintiff Black Panther Party and Huey P. Newton Why Defendants' Motion to Compel Should be Denied, *reprinted at* JA 830–850.

51. *See* Plaintiff Black Panther Party's Supplemental Responses to Interrogatories of the Federal Defendants, *reprinted at* JA 736–764.

52. *See* Affidavit of Joan Kelley, *reprinted at* JA 728–732. In her affidavit Kelley described the work she had performed for the Party since she became a member in 1969. She stated that the Party considered her to be the person best qualified to respond to the interrogatories. Kelley also testified that in preparing the responses she searched files, talked to approximately 80% of the Party's past and present members, examined back issues of *The Black Panther*, and met with members of the Party's governing body, the Central Committee.

53. *See* appellants' brief at 12; Affidavit of Huey P. Newton, *reprinted at* JA 733–735; Plaintiff Huey P. Newton's Supplemental Responses to First Interrogatories of the Federal Defendants, February 2, 1979, *reprinted at* JA 768–774.

54. *See* Opinion and Order of August 6, 1979, *reprinted at* JA 851.

55. *Id.* at JA 853.

56. *Id.* at JA 852–853.

57. *Id.* at JA 854.

58. *Id.* at JA 855.

59. In fact, the District Court did not distinguish between the two sets of interrogatories. Instead, it simply ordered Newton to respond to a list of 37 interrogatories, *id.* at JA 856–857. *See* note 66 *infra*.

The Party responded to the court's August 6, 1979 order by filing over 200 pages of supplemental answers.[60] In these new responses it provided additional information based on a complete search of back issues of its newspaper.[61] Some of the new responses helped clarify the alleged inconsistencies.[62] The Party continued to claim a First Amendment privilege with respect to portions of three interrogatories, however.[63] In addition, it refused to obey that portion of the order requiring each of the Party's officers to respond to 107 interrogatories. The Party insisted that under Rule 33 of the Federal Rules of Civil Procedure it was entitled to appoint its own representative, and that the court did not have the power to order all Party officers to respond.[64] The Party did supplement its answers to the 107 interrogatories, however. The supplemental responses were prepared by a new representative, JoNina Abron, who, in conjunction with Joan Kelley, reviewed the interrogatories to determine whether additional information might be available. Past and present members were contacted. Abron also called a meeting of the Party's Central Committee, which is its governing body; at this meeting each of the 107 interrogatories was again reviewed.[65]

Huey Newton complied with that portion of the August 6 order which required him to supplement his responses to five interrogatories. He maintained his claim of Fifth Amendment privilege with respect to 30 interrogatories, however.[66]

Several weeks after the supplemental responses were filed appellees moved to dismiss the Party and Newton under Rule 37(b). Appellees also sought their costs and attorney fees under Rule 37(b).[67] In an

**60.** *See* Plaintiff Black Panther Party's Further Supplemental Response to 107 Interrogatories as Ordered by This Court on August 6, 1979, *reprinted at* JA 874–911; Plaintiff Black Panther Party's Further Supplemental Responses Based Upon a Search of "The Black Panther" Newspaper From 1967 Through 1970 as Ordered by This Court on August 6, 1979, *reprinted at* JA 928–990; Plaintiff Black Panther Party's Further Supplemental Responses Based Upon a Search of "The Black Panther" Newspaper From 1971 Through 1974 as Ordered by This Court on August 6, 1979, *reprinted at* JA 995–1071; Plaintiff Black Panther Party's Further Supplemental Responses Based Upon a Search of "The Black Panther" Newspaper From 1975 Through 1979 as Ordered by This Court on August 6, 1979, *reprinted at* JA 1072–1130.

**61.** *See* JA 928–990, 995–1071, 1072–1130.

**62.** *See id.; see also* Plaintiff Black Panther Party's Memorandum of Points and Authorities in Support of Responses to 107 Interrogatories as Ordered by This Court on August 6, 1979, *reprinted at* JA 860.

**63.** *Id.* at JA 861–864.

**64.** *Id.* at 864–870. Rule 33 states that "any party may serve upon any other party written interrogatories to be answered by the party served or, if the party is a public or private corporation or a partnership or association or governmental agency, by any officer or agent, who shall furnish such information as is available to the party * * *."

**65.** *See* Affidavit of JoNina Abron, *reprinted at* JA 871. Abron stated that she was appointed representative because of the "increasing responsibilities which have been assumed by Ms. Joan Kelley, in conjunction with her employment * * *." *Id.* Abron also stated that she had been a Party member since 1972 and a Central Committee member since 1979. Abron had assisted Kelley in preparing the original responses.

**66.** *See* Plaintiff Huey P. Newton's Further Supplemental Responses to Interrogatories as Ordered by This Court on August 6, 1979, *reprinted at* JA 991–993. Newton supplemented his responses to the five interrogatories that did not involve a claim of Fifth Amendment privilege. He also answered two interrogatories with respect to which he had claimed the privilege because charges had recently been dismissed. Newton stated that as soon as the remaining investigations and prosecutions were resolved he would respond in full to the remaining 30 interrogatories. *See id.*

**67.** *See* Renewed Motion of Defendants Civiletti, et al., for the Sanction of Dismissal of Plaintiffs Black Panther Party's and Newton's Claims and For Costs (Oct. 30, 1979), *reprinted at* JA 923; Memorandum of Points and Authorities in Support of Renewed Motion [of] Defendants Civiletti, et al., for the Sanction of Dismissal of Plaintiffs Black Panther Party's and Newton's Claims and For Costs, R 224. *See also* Statement of Plaintiffs Black Panther Party and Huey P. Newton Why Motion of Defendants Civiletti, et al., For the Sanction of Dismissal Should Be Denied, R 230.

order dated January 25, 1980 the District Court granted these motions.[68] The court found that the Party had failed to comply with its August 6 order. Although "plaintiffs cannot choose to be litigants and at the same time exempt themselves from the rule of law that binds all federal litigants,"[69] the Party had continued to assert a First Amendment privilege. Moreover, the Party's attempt to clarify the 44 inconsistent and evasive interrogatories was inadequate.

> In some instances not only do [the supplemental answers] fail to clarify previous answers, they create further confusion. In other instances they either completely ignore the inconsistencies the Party was directed to address or they introduce new information inconsistent with that already given in this case and with information given under oath by * * * Huey Newton. * * *

JA 1132. Finally, the court stated that the Party had ignored that portion of the order which required its officers to respond to a list of interrogatories.[70]

The court also found that Newton had failed to comply with the August 6 order by continuing to claim a Fifth Amendment privilege.[71] The court then stated that imposition of the sanction of dismissal was appropriate because the Party and Newton had displayed "conscious disregard" for its order.[72] It also stated that the Party and Newton should pay the reasonable expenses incurred by appellees in bringing their motion to dismiss. Under Rule 37(b) the party failing to obey a discovery order must pay

expenses unless the court finds that the failure to obey was "substantially justified or that other circumstances make an award of expenses unjust."[73]

Although appellees' motion to dismiss referred only to Newton and the Party, the court's January 25 order and the supporting memorandum referred simply to "plaintiffs."[74] Appellants therefore filed a motion for clarification, in which they asked whether the order was intended to dismiss the entire case against all plaintiffs, including those individuals not covered by appellees' motion, or whether the order was restricted to Newton and the Party.[75] On February 13, 1980 the District Court resolved this ambiguity by entering an amended order in which it stated that all named plaintiffs were dismissed.[76]

## II. STANDARDS GOVERNING IMPOSITION OF THE SANCTION OF DISMISSAL

We will begin by describing, in general terms, the legal standards that govern imposition of the sanction of dismissal under Rule 37(b) of the Federal Rules of Civil Procedure. The rule provides that if a party fails to obey an order to provide discovery under Rule 37(a), the court "may make such orders in regard to the failure as are just * * *." A number of possible sanctions are set forth, including orders that certain facts be taken as established or evidence excluded[77]; orders that claims or de-

Rule 37(b), Fed.R.Civ.P., provides that when a party fails to obey an order to provide discovery, the court may enter an order "dismissing the action," and may require the party failing to obey the order "to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust." *See also* text and notes at notes 77–81 *infra* (describing Rule 37(b) in detail).

**68.** *See* Memorandum and Order of January 25, 1980, JA 1136–1137, 1138.

**69.** *Id.* at JA 1134.

**70.** *Id.* at JA 1133.

**71.** *Id.* at JA 1135.

**72.** *Id.* at JA 1136.

**73.** *Id.* at JA 1137.

**74.** *See id.* at JA 1136–1137, 1138.

**75.** *See* Motion of Plaintiffs to Amend Judgment Pursuant to Rule 59(e) or, Alternatively, to Direct Entry of Final Judgment Pursuant to Rule 54(b), *reprinted at* JA 1139.

**76.** *See* Amended Order and Final Judgment, *reprinted at* JA 1144.

**77.** Fed.R.Civ.P. 37(b)(2)(A) & (B).

fenses be unopposed or pleadings struck [78]; orders that reasonable expenses caused by the recalcitrant party be paid [79]; and orders that the party be held in contempt.[80] The most extreme sanction listed in Rule 37(b) is dismissal.[81]

In *Internat'l Union, UAW v. National Right to Work Legal Defense & Education Foundation, Inc. (National Right to Work)*, 590 F.2d 1139, 1152 (D.C.Cir.1979), we stated: "The validity of the sanctions imposed under [Rule 37(b)] depends, in the first instance, on the validity of the discovery orders on which they were based." *See also Smith v. Schlesinger*, 513 F.2d 462, 467 (D.C.Cir.1975).[82] That is, sanctions can be imposed for failure to obey an order compelling discovery under Rule 37(a) only if that order was justified. Thus, in this case, the validity of the District Court's order imposing the sanction of dismissal depends on the validity of the August 6 order compelling further responses.

Even when the underlying discovery order is valid, the District Courts should exercise their discretion to impose the extreme sanction of dismissal in rare circumstances. Ordinarily that sanction is appropriate only when a party has dis-played callous disregard for its discovery obligations, or when it has exhibited extreme bad faith. *See, e.g., National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976).[83] The extent to which the other party's preparation for trial has been prejudiced is a relevant consideration. If less drastic sanctions will be equally effective, they should be employed; dismissal should be used as a last resort. *See Marshall v. Segona*, 621 F.2d 763, 768 (5th Cir. 1980). It is instructive to consider the facts of *Morton v. Harris*, 628 F.2d 438 (5th Cir. 1980), a case cited by defendants, in which a District Court decision imposing the sanction of dismissal was approved. Morton refused to provide his income tax returns even after the court ordered him to do so. He implied first that he had the documents, then asserted that he had lost them, and finally produced copies of a few of the documents that had been in his possession throughout. The District Court displayed a remarkable degree of patience; before the final dismissal, it dismissed Morton once without prejudice, and then reinstated him so that he would have another opportunity to pursue his claims.[84]

---

78. Fed.R.Civ.P. 37(b)(2)(B) & (C).

79. Fed.R.Civ.P. 37(b)(2) (unlettered paragraph).

80. Fed.R.Civ.P. 37(b)(2)(D).

81. Fed.R.Civ.P. 37(b)(2)(C).

82. *National Right to Work* involved a motion under subdivision (2)(A) of Rule 37(b), which authorizes the court to enter orders stating that certain facts will be taken as established. *See Internat'l Union, UAW v. National Right to Work Legal Defense & Education Foundation, Inc. (National Right to Work)*, 590 F.2d 1139, 1152 (D.C.Cir.1979). However, the logic of that decision clearly applies to motions under subdivision (2)(D), which authorizes the court to dismiss. *See Smith v. Schlesinger*, 513 F.2d 462, 467 (D.C.Cir.1975); 8 C. Wright & A. Miller, Federal Practice and Procedure § 2289 (1970).

83. *See also Marshall v. Segona*, 621 F.2d 763, 768–769 (5th Cir. 1980); *LaClede Gas Co. v. G. W. Warnecke Corp.*, 604 F.2d 561 (8th Cir. 1977); *Wilson v. Volkswagen of America, Inc.*, 561 F.2d 494 (4th Cir.), *cert. denied*, 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 768 (1977); *Kropp v. Ziebarth*, 557 F.2d 142, 146–147 (8th Cir. 1977); *Bon Air Hotel, Inc. v. Time, Inc.*, 376 F.2d 118, 121 (5th Cir. 1967), *cert. denied*, 393 U.S. 859, 89 S.Ct. 131, 21 L.Ed.2d 127 (1968); *Gill v. Stolow*, 240 F.2d 669, 670 (2d Cir. 1957); *Szilvassy v. United States*, 82 F.R.D. 752, 755 (S.D.N.Y.1979).

84. *See also National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) (dismissal appropriate where plaintiffs failed to answer interrogatories on time despite numerous extensions, and where answers finally provided were grossly inadequate); *Margoles v. Johns*, 587 F.2d 885 (7th Cir. 1978) (dismissal affirmed where plaintiff failed to comply with District Court order requiring production of relevant documents despite substantial time lapse); *Jones v. Louisiana State Bar Ass'n*, 602 F.2d 94 (5th Cir. 1979) (dismissal affirmed in view of plaintiff's deliberately obstructive conduct in refusing to comply with valid discovery orders).

The Supreme Court has indicated that the extreme sanction of dismissal may be used, not just to penalize litigants who have acted in bad faith, but also to deter parties to other lawsuits from disregarding their discovery obligations. *See National Hockey League v. Metropolitan Hockey Club, supra,* 427 U.S. at 643, 96 S.Ct. at 2781.[85] In the absence of a valid underlying discovery order, however, or where the litigant on whom the sanction will be imposed has not displayed unusual intransigence, dismissal is not proper. The deterrence goal, by itself, will not support such a harsh result.[86]

### III. DISMISSAL OF THE BLACK PANTHER PARTY

Having outlined the standards governing imposition of the sanction of dismissal, we can proceed to consider the reasons supplied by the District Court for its actions in this case. As we have already explained, the District Court based its decision to dismiss the Party on three grounds: (1) the Party's failure to obey that portion of the August 6 order which required all officers to respond individually to a list of 107 interrogatories served on the Party; (2) the Party's failure to clarify answers the court believed to be inconsistent or evasive; and (3) the Party's failure to obey that portion of the August 6 order which required it to disclose the identities of Party members whose names were not known to the public.

As we explain below, we conclude that the three reasons supplied by the District Court do not support the decision to dismiss the Party.[87] (1) That portion of the August 6 order which required each of the Party's officers to respond to 107 interrogatories

was not valid. Thus under *National Right to Work, supra,* the Party's failure to obey this requirement does not justify imposition of sanctions. (2) That portion of the August 6 order which required the Party to explain allegedly inconsistent or evasive answers probably was valid. We find, however, that the Party's supplemental responses adequately explained any apparent inconsistencies or evasiveness. The District Court's decision to impose the sanction of dismissal cannot be justified on this ground. (3) We cannot determine on the basis of the record as it now stands whether that portion of the August 6 order which required the Party to divulge the identities of members not known to the public was valid. If it was not, then the Party's failure to comply could not justify imposition of sanctions.

We set forth the legal principles that the District Court should have applied in determining whether the claim of privilege was proper, and remand so that it may reconsider this question. On remand, if the District Court concludes that the claim of privilege should have been upheld, then the Party should be reinstated and given another opportunity to pursue its claims. If the court concludes that the claim of privilege was properly denied, it may enter a new order compelling the Party to respond. If the Party then refuses to comply, the court may consider imposing sanctions.

### A. *Requiring Each Party Officer to Respond to Interrogatories*

In its August 6 order the District Court stated that each Party officer should respond under oath to a list of 107 interrogatories originally served on the Party. In

---

**85.** *See also Dellums v. Powell,* 566 F.2d 231, 235–236 (D.C.Cir.1977); *Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp.,* 602 F.2d 1062, 1066–1067 (2d Cir. 1979); *see generally* Note, *The Emerging Deterrence Orientation in the Imposition of Discovery Sanctions,* 91 Harv.L.Rev. 1033 (1978).

**86.** *See National Hockey League v. Metropolitan Hockey Club, supra* note 84, 427 U.S. at 643, 96 S.Ct. at 2781; *Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp., supra*

note 85, 602 F.2d at 1066–1069; *see also* Note, *supra* note 85, 91 Harv.L.Rev. at 1043–1055 (noting possible constitutional problems).

**87.** Courts ordinarily determine whether the sanction of dismissal should be imposed by examining the entire record. *See, e.g., National Hockey League v. Metropolitan Hockey Club, supra* note 85, 427 U.S. at 642, 96 S.Ct. at 2780. We follow this procedure here.

our view, the District Court erred when it ruled that each of the officers must respond. It lacked the power to make such an order under the Federal Rules of Civil Procedure.

■ Under Rule 33(a) of the Federal Rules of Civil Procedure, an organization is entitled to designate the officer or agent who will prepare responses to interrogatories.[88] The organization has broad discretion in making this choice. *See* 8 C. Wright & A. Miller, Federal Practice and Procedure § 2171 at 530, § 2172 at 539 (1970); *Holland v. Minneapolis-Honeywell Regulator Co.*, 28 F.R.D. 595 (D.D.C.1961) (party serving interrogatories may not select officer or agent of adverse party).[89] When the responses prepared by the designee are inadequate, or when the designee improperly objects to the interrogatories, the District Court may grant a motion to compel further responses under Rule 37(a).[90] If this order is not obeyed, the court may grant a motion for sanctions under Rule 37(b), which, as we have seen, empowers it to "make such orders in regard to the failure as are just * * *."[91] In situations where the organization completely fails to respond to interrogatories, a motion to compel dis-

covery under Rule 37(a) is not necessary. Instead, the party that served the interrogatories may immediately move for sanctions under Rule 37(d). This rule also gives the court discretion to "make such orders in regard to the failure as are just * * *."[92]

■ The District Court's August 6 order requiring each of the Party's officers to respond was not consistent with the scheme set forth in the Rules. The original responses to the 107 interrogatories were prepared by Joan Kelley.[93] In many of her answers she stated that only limited information could be provided because records were not available.[94] In other answers Kelley referred to the Senate Report describing the FBI's counterintelligence activities.[95] And in several others, where the government had asked questions designed to obtain admissions from the Party that it had engaged in unlawful activities, she simply stated that it possessed no information.[96] The District Court was apparently concerned that this lack of information would hinder preparation of the defendants' case; it stated that an order requiring all officers to respond was appropriate because records were unavailable and witnesses were scattered, and because many of the events com-

**88.** *See* note 64 *supra* (*quoting* Rule 33(a)).

**89.** *See also Straley v. Idaho Nuclear Corp.*, 94 Idaho 917, 500 P.2d 218, 224 (1972) (corporation has right to select which of its officers or agents shall answer interrogatories).

**90.** *See* note 44 *supra* (*quoting* text of Fed.R. Civ.P. 37(a)).

**91.** *See* text and notes at notes 77–81 *supra* (describing Fed.R.Civ.P. 37(b)).

**92.** *See* note 37 *supra* (*quoting* text of Fed.R. Civ.P. 37(d)).

**93.** For a list of the 107 interrogatories, *see* JA 854.

**94.** For example, in one interrogatory appellees asked for all documents describing the functions of the Party's Central Committee. Kelley responded that there were no such documents. *See* Plaintiff Black Panther Party's Responses to Interrogatories of the Federally Represented Defendants, JA 98 (response to Interrogatory 23). In another appellees asked for a list of all offices of the Party newspaper that were alleged to have been vandalized. Kelley responded that, because files on such actions were not kept, only a partial list could be provided. *See id.* at JA 198.

In her affidavit Kelley denied that the Party had intentionally destroyed any records. She conceded that some documents had been "inadvertently thrown away over time." Affidavit of Joan Kelley, JA 731.

**95.** For example, when asked to describe the basis for allegations that the government had instigated the murder of several Party members, she simply referred to several pages of the Senate Report, *supra* note 19. *See* Plaintiff Black Panther Party's Responses to Interrogatories of the Federally Represented Defendants, JA 163–164.

**96.** For example, when asked to describe Party participation in the torture or torture-murder of Party members, Kelley stated that the Party had no information concerning any such events. *See id.* at JA 171 (responses to Interrogatories 154 and 155).

**1258**

plained of had occurred several years in the past.[97]

 Nothing in the Rules, however, gave the District Court discretion to order all officers to respond simply because it believed that the original responses prepared by the Party's designee did not contain sufficient information. Rule 37(a) states that when a designee's original responses are inadequate, the court may enter an order requiring supplemental responses. It does not give the court power to override an organization's choice of representative under Rule 33(a).[98] It may be true that Kelley's original search for information could have been more vigorous; the fact that JoNina Abron was able to uncover additional information when she prepared the supplemental responses to the 107 interrogatories supports this conclusion. Under the circumstances, however, the District Court should have simply entered an order requiring the Party and its representative to con-

duct a more complete search for information. Then, if it concluded that the representative's response to this order was inadequate, it might have had power under Rule 37(b) to require all Party officers to respond to the 107 interrogatories; that rule, unlike Rule 37(a), does give the courts broad discretion to fashion appropriate orders.[99]

 Appellees suggest that the District Court's order was authorized by Rule 37(d), which, as we stated above, confers power to make such orders as are just when a party completely fails to respond to interrogatories. They argue, in effect, that Kelley's original answers to the 107 interrogatories were so inadequate as to constitute a total failure to respond. But Rule 37(d) has not been interpreted to apply when a party has actually served answers, unless the responses provided are so incomplete as to be grossly inadequate, or unless there is evidence of evasiveness. *See* 8 C. Wright & A. Miller,

---

**97.** *See* Opinion and Order of August 6, 1979, JA 854. Elsewhere in its August 6, 1979 opinion the District Court noted:

> The posture of this case at this point in discovery is unusual in several respects. First, plaintiffs have either lost or destroyed virtually all of the relevant documents. Secondly, plaintiffs waited several years after the alleged actions complained of began taking place to file this lawsuit. Third, plaintiffs are asking for injunctive relief from officials presently in office, but are requesting damages from past officials.

JA 851.

**98.** Even if Rule 37(a) can be interpreted as giving the court authority, not only to order new responses, but also to override the Party's choice of representative, such action was inappropriate here. At the very least, Rule 33(a) establishes a strong presumption in favor of the organization's designated agent. In the absence of evidence suggesting that the agent has acted in bad faith, or some other unusual circumstance, this presumption should prevail. Here the District Court expressly found that the Party had "made a good faith effort to provide full and complete answers to the interrogatories in question." JA 854. It did note that the case was unusual because of "the scarcity of records," "the time lapse between the alleged occurrences and the present," "unavailability of many witnesses," *id.*, and the fact that appellants were seeking damages from past officials. JA 851, *see* note 97 *supra*. But

none of these circumstances can be attributed to misbehavior on the part of appellants. There is no suggestion, for example, that the Party intentionally delayed filing suit; in its complaint the Party states that it learned of many of the events complained of only after the Senate Report was published in 1976. Nor is there any evidence suggesting that the Party intentionally destroyed records. *See* note 94 *supra*. And although these "unusual" circumstances may demonstrate a need for information, they do not support a decision to override the Party's choice of representative. We note that appellees will have an opportunity to depose other Party officers at a later stage of discovery.

**99.** Appellants suggest that, even under Rule 37(b), the District Court could not require Party officers to respond to interrogatories. They argue that under Rule 33(a) interrogatories may not be served on persons who are not named parties. They then point out that the Party officers are not named parties to this action. But Rule 33(a) refers only to the initial service of interrogatories. In our view, the court's authority under Rule 37(b) "to make such orders as are just" would encompass, in some circumstances, the power to require individuals other than an organization's original representative to respond to interrogatories. We believe such circumstances would be rare, however. *Cf.* note 98 *supra*.

*supra*, § 2291.[100] We do not feel that the original responses could be characterized as grossly inadequate. After all, they totalled more than 100 pages. Indeed, the District Court expressly found that the Party had conducted a "good faith search" for information.[101]

[11] Because we do not believe the District Court properly ordered the Party's officers to respond to the 107 interrogatories, the Party's failure to obey this order cannot support imposition of the sanction of dismissal. But even if the underlying discovery order was valid, we would not be able to find that the failure to obey supports dismissal. The Party did not refuse to provide any more information. Its new representative, JoNina Abron, submitted a comprehensive set of supplemental responses totalling more than 50 pages. Moreover, appellants' refusal to comply with the court's order was based on a colorable legal claim. The Party's behavior could not be said to constitute the sort of inexcusable intransigence that would justify imposing the extreme sanction of dismissal. *Cf. Morton v. Harris, supra*.[102] It is also relevant to note that appellees are not prejudiced by the Party's failure to comply with the terms of the August 6 order. *See Marshall v. Segona, supra*. Again, JoNina Abron's supplemental responses are quite detailed. Moreover, appellees would have had an opportunity to depose Party officers during later stages of discovery. Indeed, because the Party refused to comply, a potentially confusing situation was avoided. The purpose of serving interrogatories on the Party was to obtain admissions. But if each of the officers had responded, it would have been unclear whether they were speaking for themselves or their organization.[103]

100. *See also Airtex Corp. v. Shelley Radiant Ceiling Co.*, 536 F.2d 145 (7th Cir. 1976); *Alliance to End Repression v. Rochford*, 75 F.R.D. 438 (N.D.Ill.1976); *Southard v. Pennsylvania R. Co.*, 24 F.R.D. 456 (E.D.Pa.1959).

101. *See* Opinion and Order of August 6, 1979, JA 854. This argument is also inconsistent with the fact that appellees' motion was a motion to compel under Rule 37(a), not a motion for immediate sanctions under Rule 37(d). And it fails to recognize that at an earlier stage in the proceedings the District Court found that a motion for immediate sanctions under Rule 37(d) was inappropriate, and that appellees must proceed under Rules 37(a) and 37(b). As we explained earlier, *see* text and notes at notes 47–48 *supra*, appellees moved for dismissal shortly after the Party filed its original responses to the interrogatories. The Party objected, arguing that appellees must first file a motion to compel under Rule 37(a). The District Court apparently agreed.

102. *See generally* Part II *supra*.

103. Moreover, to the extent the District Court was concerned about possible inconsistencies in the responses, requiring each of the officers to respond would probably have magnified the problem.

The dissenting opinion levels a broad attack against the analysis employed in Part III–A, arguing that, although the scheme set forth in the Rules governs the actions of the parties, it does not circumscribe the power of the District Court. According to the dissent, the District Court has inherent authority to supervise the discovery process. This authority would include the power to enter any orders it believes are reasonable under the circumstances. Thus, in this case, because the order requiring each of the Party's officers to respond to a list of interrogatories constituted reasonable intervention, it should be affirmed. Dissenting opinion, Part I. We disagree. In our view, the court does not have the power to depart from the Rules and intervene in the discovery process at will. Such power would be inconsistent with one of the general policies underlying the Rules—that the conduct of discovery is to be left to the parties themselves, except when they ask for the assistance of the court. Moreover, if the court did possess such broad authority, the scheme set forth in the Rules, which carefully delineates the actions available to the parties and the court in specific instances during discovery, would be rendered superfluous.

In fact, the Supreme Court has criticized reliance on "inherent power" as a basis for imposing sanctions during the discovery process. In *Societe Internationale v. Rogers*, 357 U.S. 197, 207, 78 S.Ct. 1087, 1093, 2 L.Ed.2d 1255 (1958), the Court disapproved a lower court's attempt to predicate dismissal of a complaint on its inherent power.

In our opinion, whether a court has power to dismiss a complaint because of noncompliance with a production order depends exclusively upon Rule 37, which addresses itself with particularity to the consequences of a failure to make discovery by listing a variety of remedies which a court may employ as well as by authorizing any order which is "just." * * * Reliance upon * * * "inherent power[ ]" can only obscure analysis of the problem before us. * * *

## B. *Inconsistent and Evasive Responses*

Another reason supplied by the District Court to justify dismissal is its finding that the Party failed adequately to clarify 44 responses to interrogatories that the court considered to be inconsistent or evasive. We are unable to conclude that the portion of the August 6 order requiring clarification or additional information was invalid.[104] We find, however, that the District Court erred when it ruled that the supplemental responses did not provide sufficient clarification. In our view, the explanation provided by the Party was adequate. Dismissal could not be justified on the ground that the Party failed to comply with this portion of the August 6 order.

As the Party points out in its brief, the interrogatories to which further responses were directed on the ground that the original answers were inconsistent or evasive can actually be divided into five categories.[105] First, there were interrogatories with respect to which the Party had claimed a First Amendment privilege.[106] Second, there were interrogatories that the Party objected to on grounds of burdensomeness.[107] Third, there were interrogatories to which the Party responded by referring appellees to its newspaper.[108] Fourth, there were interrogatories which sought further information concerning allegations in the Party's complaint, and to which the Party responded that it would be relying on discovery received from appellees.[109] Finally, there were interrogatories the responses to which appellees disputed as a matter of fact because they believed them to be inconsistent with other evidence.[110] Thus the court's description of each of the 44 responses as "inconsistent or evasive" may be somewhat broad.

The Party's responses to the interrogatories that fall within the first four categories clearly do not support dismissal at this stage. As we have already seen, the responses involving a claim of First Amendment privilege were not only included in the list of 44 inconsistent and evasive answers, but were also made the subject of a separate portion of the August 6 order; we show *infra* that it is unclear on the basis of the record as it now stands whether the claim of privilege was properly denied. Dismissal cannot be justified on the ground that the Party has refused to disclose its membership list until after the District Court has reconsidered the privilege question.[111] As for the interrogatories that the Party objected to on grounds of burden-

*See also Independent Productions Corp. v. Loew's Incorporated,* 283 F.2d 730 (2d Cir. 1960) (court erred in dismissing action with prejudice on basis of its inherent power; complete adherence to the clearly delineated procedures of Rule 37 is required). *Societe Internationale* and *Independent Productions Corp.* strongly support our conclusion that the District Court's actions here were inappropriate.

**104.** With respect to some of the interrogatories, however, we believe the order for clarification or supplementation was unwarranted. For example, the District Court included in the list of 44 interrogatories those questions with respect to which the Party claimed a First Amendment privilege. *See* text and notes at notes 106, 111 *infra.* This portion of the order has not been adequately justified. *See* Part III–D *infra.* But we do not dispute the District Court's conclusion that, because of apparent factual inconsistencies, clarification of certain other interrogatories was required. *See* text at note 115 *infra.*

**105.** To a certain extent, these categories are overlapping. *Compare* notes 106–110 *infra.*

The District Court did not rely on these categories.

**106.** *See* Plaintiff Black Panther Party's Responses to Interrogatories of the Federally Represented Defendants at JA 95–97, 108–109, 121 (responses to Interrogatories 21, 33, 61).

**107.** *See id.* at JA 99, 108–109, 121, 201 (responses to Interrogatories 25, 33, 61, 223).

**108.** *See id.* at JA 116, 153, 155–159, 175–176 (responses to Interrogatories 49, 114, 115, 120, 121, 123, 163, 164, 223, 224).

**109.** *See id.* at JA 111–112, 154–159, 164 (responses to Interrogatories 40, 41, 114, 115, 119, 120, 121, 122, 123, 131, 132).

**110.** *See id.* at JA 91, 93–94, 98, 107, 108, 110, 120, 124, 129, 168–169, 183, 193 (responses to Interrogatories 16, 18, 22, 27, 32, 36, 58, 59, 72, 73, 75, 90, 91, 98, 144, 184, 203).

**111.** *See* Part III–D *infra.*

someness, we note that supplemental responses were provided after the District Court entered its August 6 order. Review of these new responses convinces us that the Party has fulfilled its obligations.[112] With respect to those interrogatories that the Party answered by referring to its newspaper, we point out that in its August 6 order the court explicitly ruled that the Party must prepare supplemental responses after conducting a full search of the publication. The Party did conduct this search.[113] In the opinion accompanying its order dismissing appellants the court noted that the Party had supplemented its responses on the basis of information drawn from *The Black Panther*.[114] As for the interrogatories which asked for further information regarding the Party's claims, and which the Party responded to by stating that it hoped to rely on further discovery from appellees, we have seen no evidence suggesting that the Party made these

claims as part of a conscious effort to conceal relevant information. A decision to dismiss could not be justified on this ground.

The category of interrogatories to which appellees objected on the ground that the original responses were inconsistent with other evidence requires only slightly more attention. Having examined the Party's responses to each of the interrogatories that fall within this category, we cannot conclude that the portion of the District Court's August 6 order requiring clarification constituted an abuse of discretion; although many of the contradictions pointed to by appellees involve relatively insignificant issues, we believe that such an order was warranted. We do conclude, however, that the Party adequately explained the apparent inconsistencies in its supplemental responses and in the memoranda supporting its opposition to appellees' motions.[115] The District Court's finding to the contrary is

112. *See* Plaintiff Black Panther Party's Supplemental Responses to Interrogatories of the Federally Represented Defendants at JA 741, 761 (responses to Interrogatories 25, 223); Plaintiff Black Panther Party's Further Supplemental Responses to 107 Interrogatories as Ordered by This Court on August 6, 1979 at JA 879, 885, 906 (responses to Interrogatories 25, 61, 223); Plaintiff Black Panther Party's Further Supplemental Responses Based Upon a Search of "The Black Panther" Newspaper From 1967 Through 1970 as Ordered by This Court on August 6, 1979 at JA 934–936, 953–956, 987 (responses to Interrogatories 33, 61, 223).

113. *See id.* at JA 928, 995, 1072.

114. JA 1134–1135. The court did not expressly state that the Party had complied with its August 6 order. Our own review, however, convinces us that the Party's search was complete.

115. The Party's allegedly inconsistent responses, as well as its explanations, are contained in the Joint Appendix: for Interrogatory 16, regarding Party rules, *see* JA 91, 542, 694–695, 738, 835; for Interrogatory 18, regarding the number and responsibilities of Party officers, *see* JA 93, 544, 695–696, 740, 835–836; for Interrogatory 22, also regarding the number and responsibilities of Party officers, *see* JA 97–98, 544, 697–699, 836; for Interrogatory 27, regarding the corporate status of Party affiliates, *see* JA 107, 690–700; for Interrogatory 32, regarding staff positions in Party affiliates, *see* JA 108, 700, 837; for Interrogatory 36, regarding the duties of regional Party chapters, *see*

JA 110, 544–545, 701–702, 741–748, 837; for Interrogatories 58–59, regarding sponsorship of the Conference on the Black Panther Party's Right to Exist, *see* JA 119–120, 547, 703–705, 750–751, 838–839; for Interrogatories 72–73, regarding the Party's receipt of stolen goods, *see* JA 124, 547, 705–706, 839; for Interrogatory 75, regarding the Party's rules on carrying firearms, *see* JA 124, 547–548, 706, 751, 840; for Interrogatories 89–92, regarding the Party's advocacy of murder of government officials, *see* JA 128–130, 549, 556–562, 709–710, 840, 888; for Interrogatory 98, regarding the nexus between the Party and Stronghold Consolidated Products, Inc., *see* JA 131–136, 549, 710–711, 846; for Interrogatory 144, regarding the Party's participation in the torture-murder of a Party member, *see* JA 169, 550–551, 717–718, 756–757, 841; for Interrogatory 184, regarding an inflammatory comic book allegedly distributed by the Party, *see* JA 183, 551–552, 720–721, 758, 842; for Interrogatory 203, regarding diversion of funds donated to the Party, *see* JA 193, 723, 841. *See also* Statement of Plaintiffs Black Panther Party and Huey P. Newton Why Motion of Defendants Civiletti, et al., For the Sanction of Dismissal Should Be Denied, R 230 at 10–13. We note that in their Renewed Motion for Sanctions appellees continued to contest only nine of these interrogatories: Interrogatories 16, 18, 58, 59, 72, 73, 75, 98, 144. *See* appellants' brief at 40. They were apparently satisfied with the Party's explanation of its other responses.

clearly erroneous. Appellees may continue to dispute the accuracy of the Party's responses. But dissatisfaction with an opposing party's responses to discovery requests is not unusual in complex cases. These disputes may be resolved at trial. Certainly, the Party has not displayed the sort of conscious disregard for its discovery obligations that would justify imposition of the sanction of dismissal.

We will not discuss each of the disputed answers here. Instead, we will simply describe several responses that seemed to present particularly troublesome contradictions. One example concerns allegedly inconsistent statements made regarding the size and composition of the Party's governing body, the Central Committee. In one of its original responses to appellees' interrogatories the Party stated that "the Party is and always has been governed by a fifteen-member body known as the Central Committee." [116] The Party also listed the names of 22 past and present Committee members whose identities were known to the public.[117] The government challenged the accuracy of these statements. It pointed to responses to interrogatories made by Huey Newton in which Newton confirmed that the Central Committee was a 15-member body but named only eight past and present members whose identities were publicly known.[118] It also noted that in an unrelated criminal trial Newton testified that when he left the United States in 1974 the Central Committee consisted of himself and Elaine Brown, and that when he returned to this country in 1977 Elaine Brown left the Party and the Committee dissolved.[119] Finally, the government notes that in an unrelated civil case Elaine Brown responded to interrogatories by identifying a total of 10 Committee members. Brown did not explain whether she intended to identify all members of the Committee or only the past and present members whose names were publicly known.[120]

The Party's explanation is complex, but fully coherent. In one set of supplemental responses it clarified its first answer by stating that

the Central Committee has always consisted of approximately fifteen members. This number has fluctuated slightly. At times, there have been more than fifteen people on the Central Committee, and at other times there have been fewer than fifteen people. At present, for example, there are twelve members of the Central Committee.[121]

As for the testimony of Newton in the unrelated criminal trial, the Party explained that when he said the Central Committee consisted only of him and Elaine Brown in 1974, and that it subsequently dissolved, he intended to refer to a central core within the Committee. According to the Party, this core consisted of the Committee members with whom Newton, as Party leader, was most likely to confer before making major decisions.[122] This expla-

116. Plaintiff Black Panther Party's Responses to Interrogatories of the Federally Represented Defendants at JA 93 (response to Interrogatory 18).

117. *See id.* at JA 96–97 (response to Interrogatory 21) (listing 20 names); Plaintiff Black Panther Party's Supplemental Responses to Interrogatories of the Federally Represented Defendants at JA 738 (listing one additional name); Affidavit of JoNina Abron at JA 872 (stating that JoNina Abron is a Central Committee member).

118. Plaintiff Black Panther Party's Answers to Defendant George C. Moore's Interrogatories (made by Huey P. Newton), *reprinted at* JA 72.

119. *See* Partial Transcript of *People v. Newton,* Superior Court of California, County of Alame-

da No. 65474, *reprinted at* JA 819, 826, 828; *see also* Statement of Defendants Bell, et al., [of] Interrogatories Sought to Be Compelled, *reprinted at* JA 775, 813–814.

120. *See* Response of Plaintiff Black Panther Party to Defendants' First Interrogatories in *Dellinger v. Mitchell,* D.D.C. Civil Action No. 1768–69, *reprinted at* JA 677–685 (responses prepared by Elaine Brown).

121. Plaintiff Black Panther Party's Further Supplemental Response to 107 Interrogatories as Ordered by This Court on August 6, 1979 at JA 876.

122. *See* Statement of Plaintiffs Black Panther Party and Huey P. Newton Why Motion of Defendants Civiletti, et al., For the Sanction of Dismissal Should Be Denied, R 230 at 12.

nation is plausible: the Party suggested that such a central core existed in its original responses.[123] The Party also stated that when Elaine Brown identified 10 Committee members she probably intended to identify only those past and present members whose names were already known to the public. It further explained that the Party identified 22 past and present members, whereas Newton and Brown identified only eight and 10 respectively, because it realized that, over time, more names had become public.[124]

Another dispute involves an effort by appellees to obtain evidence establishing that the Party was committed to violence.[125] In its interrogatory the government asked the Party to provide a list of its rules and by-laws. The Party provided a list,[126] but appellees claimed that the response was evasive because it failed to include two items known as the "8 Points of Attention" and the "3 Main Rules of Discipline," which had been included in Party publications.[127] According to the government, these two items contained rules suggesting that the Party was a violent organization.[128] The Party explained that the "8 Points· of Attention" and the "3 Main Rules of Disci-

pline" were provided merely as examples of the rules of another revolutionary organization. It conceded that a Party press release implied that the rules applied to Party members. It claimed, however, that the press release was based on an article in *The Black Panther,* and that this article supported the Party's position.[129] We think this explanation is adequate.

A third example also involves an effort to obtain an admission that the Party was a violent organization. Appellees asked whether Party members were required or encouraged to carry firearms. The Party responded by stating, "Within the limits of the law and the Constitution, the right to bear arms and defend one's home and property was not discouraged."[130] Appellees argued that this answer was evasive. The Party supplemented its response by stating that, although Party members were not required to carry or train with firearms, "the atmosphere of harassment by law enforcement officers was such that members were encouraged to carry firearms." It also noted that under Party rules members were forbidden to carry weapons while intoxicated, or to use weapons unnecessarily.[131] We

**123.** *See id.;* Plaintiff Black Panther Party's Responses to Interrogatories of the Federally Represented Defendants at JA 93 (response to Interrogatory 18).

**124.** *See* Plaintiff Black Panther Party Memorandum of Points and Authorities in Support of Motion to Compel Discovery at JA 696.

**125.** Appellees hoped to defend their actions on the ground that the Party was engaged in violent activities.

**126.** *See* Plaintiff Black Panther Party's Responses to Interrogatories of the Federally Represented Defendants at JA 91 (response to Interrogatory 16).

**127.** *See* Statement of Defendants Bell, et al.: Interrogatories Sought to be Compelled at JA 778–779; *see also* Reply Memorandum to Opposition to Motion of Defendants Bell, et al. to Compel Discovery of Plaintiff Newton, R 214.

**128.** The "8 Points of Attention" are:
 1. Speak politely.
 2. Pay fairly for what you buy.
 3. Return everything you borrow.
 4. Pay for anything you damage.
 5. Do not hit or swear at people.

 6. Do not damage property or crops of the poor, oppressed masses.
 7. Do not take liberties with women.
 8. If we ever have to take captives, do not ill treat them.

The "3 Main Rules of Discipline" are:
 1. Obey orders in all your actions.
 2. Do not take a single needle or piece of thread from the "poor and oppressed" masses.
 3. Turn in everything captured from the attacking enemy.

JA 705–706.

**129.** *See* Plaintiff Black Panther Party Memorandum of Points and Authorities in Support of Motion to Compel Discovery at JA 694–695; *see also* appellants' brief at 41.

**130.** *See* Plaintiff Black Panther Party's Responses to Interrogatories of the Federally Represented Defendants at JA 124 (response to Interrogatory 75).

**131.** *See* Plaintiff Black Panther Party Memorandum of Points and Authorities in Support of Motion to Compel Discovery at JA 706.

find that this answer is sufficiently responsive.

A final example involves two interrogatories in which appellees asked whether Party members were encouraged to give the Party a portion of the proceeds whenever goods were "taken without an exchange of consideration."[132] The Party denied this allegation. Appellees argued that this answer was inconsistent with information contained in a House Committee on Internal Security Report, *Gun-Barrel Politics: The Black Panther Party 1966–1971*, 92d Cong., 1st Sess. 55 (1971), as well as with the "8 Points of Attention" and the "3 Main Rules of Discipline."[133] The Party responded by pointing out that the House Committee Report discounted the reliability of the source on which the allegation was based; it also noted that other statements by the Party and the "8 Points" and the "3 Main Rules" themselves supported the Party's denial.[134] Again, we believe the response, as supplemented, is adequate.

### C. *Claim of First Amendment Privilege: A Balancing Test*

We have already held that the Party justifiably refused to obey the portion of the August 6 order requiring each of its officers to respond to 107 interrogatories, and that it adequately complied with the portion of the order requiring it to clarify 44 of its original responses. Thus the only reason supplied by the District Court to support dismissal that remains for our consideration is its finding that the Party unjustifiably claimed a First Amendment privilege.

In the three interrogatories with respect to which the Party continues to claim a First Amendment privilege appellees requested the names of all Party officers, the names of the leaders of local Party affiliates, and any documents reflecting the belief that appellees had conspired to destroy the Party.[135] The Party responded in part, providing the names of 59 Party officers[136] and 68 publicly known local leaders.[137] It also provided the requested documents. Although it deleted from these materials all names of members not publicly known, it listed the names of 600 members whose identities were public.[138]

The Party claims that the identities of its leaders and members who are not known to the public are privileged under the First Amendment; it suggests that if the names of these individuals are released, they will be harassed and their rights of expression and association will be infringed. The Party goes on to contend that because of this privilege the August 6 discovery order requiring it to disclose the names could not be justified. Thus its failure to obey provides no support for the decision to dismiss. The Party is clearly correct when it states that District Courts may not order disclosure of privileged information. Rule 26 expressly provides that parties may not obtain discovery of matters that are privileged.[139] It is far more difficult to determine whether, under the circumstances presented by this

---

132. *See* Plaintiff Black Panther Party's Responses to Interrogatories of the Federally Represented Defendants at JA 124 (Interrogatories 72 and 73).

133. *See* Memorandum of Points and Authorities in Support of Motion of Defendants Bell, et al., to Compel Plaintiff Black Panther Party to Respond to Discovery, R 207 at 39. *See also* text and notes at notes 127–128 *supra* (discussing "8 Points" and "3 Main Rules").

134. *See* Plaintiff Black Panther Party Memorandum of Points and Authorities in Support of Motion to Compel Discovery at JA 705.

135. *See* Federal Defendants' First Interrogatories to Plaintiff Black Panther Party, R 105 (Interrogatories 21, 33, 61).

136. *See* JA 95–96, 877, 932–933, 999.

137. *See id.* at JA 934–936, 1000. The Party also noted that 100 local leaders were identified in a report prepared by the House Committee on Internal Security, *Gun Barrel Politics: The Black Panther Party 1966–1971*, 92d Cong., 1st Sess. (1971).

138. *See* appellants' brief at Appendix A.

139. Rule 26(b)(1), Fed.R.Civ.P., states: "Parties may obtain discovery regarding any matter, *not privileged*, which is relevant to the subject matter involved in the pending action * * *." (Emphasis added.)

case, the Party has made a valid claim of privilege.

Membership lists of groups engaged in political expression clearly deserve some First Amendment protection. The Supreme Court recognized this need in *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), which held that Alabama could not force the NAACP to reveal its membership list. The Court stated, "It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute [an] effective * * * restraint on freedom of association * * *." *Id.* at 462, 78 S.Ct. at 1171.[140] Privacy is particularly important where the group's cause is unpopular; once the participants lose their anonymity, intimidation and suppression may follow. And privacy is important where the government itself is being criticized, for in this circumstance it has a special incentive to suppress opposition. *First National Bank of Boston*

*v. Bellotti*, 435 U.S. 765, 777 n.11, 98 S.Ct. 1407, 1416, 55 L.Ed.2d 707 (1978).

Appellees suggest that even if the Party's membership list would ordinarily be entitled to some First Amendment protection, it automatically waived whatever constitutional rights it possessed when it filed this lawsuit. The logic behind this automatic waiver rule may, at first glance, seem appealing. After all, plaintiffs are "voluntary" litigants; they have created the situation that threatens their constitutional rights. This reasoning has led at least one court to adopt a waiver rule. *See Independent Productions Corp. v. Loew's, Incorporated*, 22 F.R.D. 266 (S.D.N.Y.1958).[141] But in our view, the appeal of this logic is superficial only. Ordinarily, plaintiffs file suits because they believe the courts provide the best, if not the only, means to protect their rights. To say they must waive those rights when they come into court would make any judicial protection meaningless.[142] Here, for example, the

---

**140.** *See also Bates v. City of Little Rock*, 361 U.S. 516, 527, 80 S.Ct. 412, 418, 4 L.Ed.2d 480 (1960) (protecting membership list); *National Right to Work, supra* note 82, 590 F.2d 1139 (same); *Familias Unidas v. Briscoe*, 544 F.2d 182, 192 (5th Cir. 1976) (same); *Hastings v. North East Independent School District*, 615 F.2d 628 (5th Cir. 1980) (same); *Doe v. Martin*, 404 F.Supp. 753 (D.D.C.1975) (same).

**141.** In *Independent Productions Corp. v. Loew's, Incorporated*, 22 F.R.D. 266, 176 (S.D. N.Y.1958), the court stated that "there is no testimonial privilege of silence based on the First Amendment." It went on to say that, even if there were such a privilege, it would not apply where the person wishing to assert the privilege was the plaintiff, since:

It would be uneven justice to permit plaintiffs to invoke the powers of this court for the purpose of seeking redress and, at the same time, to permit plaintiffs to fend off questions, the answers to which may constitute a valid defense or materially aid the defense.

*Id. See also* note 161 *infra* (listing cases that uphold waiver rule with respect to claim of Fifth Amendment privilege). *But see generally* Part II *supra* (rejecting waiver in Fifth Amendment context).

On the surface, *Anderson v. Nixon*, 444 F.Supp. 1195 (D.D.C.1978), which was cited by the District Court, *see* JA 853, 1134, appears to adopt an automatic waiver rule. In that case a plaintiff newspaper columnist refused to reveal confidential sources to the defendant, claiming

a First Amendment privilege. The court ordered disclosure after stating that a balancing approach was "unrealistic" when the person claiming the privilege had initiated the lawsuit. *Id.* at 1199. Despite this language, it appears that the court did in fact balance the plaintiff's First Amendment rights against the defendant's need for disclosure. It ordered disclosure only after finding that extensive discovery had already taken place, that alternative sources had been exhausted, and that the information sought went to the heart of the case.

Moore's *Federal Practice*, also cited by the District Court, *see* JA 1134, might also be interpreted as advocating a waiver rule; in discussing whether parties may claim a constitutional privilege during discovery it uses the terminology of waiver. In fact, however, Moore would find "waiver" only where the information with respect to which a privilege has been asserted is basic to the case. *See* 4 J. Moore, Federal Practice ¶ 26.60[6] at 252 (1979).

**142.** *See Wehling v. Columbia Broadcasting System*, 608 F.2d 1084, 1089 n.10 (5th Cir. 1979) (rejecting voluntary/involuntary distinction in Fifth Amendment context); *see also* Note, *Plaintiff as Deponent: Invoking the Fifth Amendment*, 48 U.Chi.L.Rev. 158, 162–164 (1981) (criticizing distinction); Note, *Toward a Rational Treatment of Plaintiffs Who Invoke the Privilege Against Self-Incrimination During Discovery*, 66 Iowa L.Rev. 575, 584–587 (1981) (same). The defendant, as much as the plaintiff, may be responsible for the decision to file a

Party is suing the government in part because it believes the government has infringed its First Amendment rights of expression and association. An automatic waiver rule would frustrate this purpose. Indeed, requiring plaintiffs to choose between waiver of their constitutional rights and dismissal raises serious due process questions; if plaintiffs have a right to a day in court, that right is seriously infringed.[143]

■ In our view, a balancing inquiry should be conducted to determine whether a claim of privilege should be upheld. Before granting a motion to compel discovery and forcing a plaintiff to choose between disclosure and sanctions, the plaintiff's First Amendment claim should be measured against the defendant's need for the information sought. If the former outweighs the latter, then the claim of privilege should be upheld. In this way the interests of both parties can be protected. Use of balancing tests to determine whether compelled disclosure is necessary is well established in the First Amendment context. In *NAACP v. Alabama, supra*, 357 U.S. at 463, 78 S.Ct. at 1172, the Supreme Court stated that disclosure of membership lists by the defendant NAACP and the accompanying abridgement of its freedom of association would be appropriate only if the state could demonstrate a compelling interest in disclosure. A balancing test was also used by this court in *National Right to Work, supra*, where we held that the defendant, the National Right to Work Legal Defense and Educational Fund, could be forced to disclose its contributors only after a detailed inquiry into the other party's need for the information.[144] Balancing tests are also used to determine whether reporters must disclose their confidential sources to civil litigants. *See, e.g., Zerilli v. Smith*, 656 F.2d 705 (D.C.Cir. 1981); *Carey v. Hume*, 492 F.2d 631 (D.C.Cir.), *cert. dismissed*, 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974).[145] To be sure, these cases do not involve attempts by plaintiffs to claim a First Amendment privilege. But nothing

lawsuit; presumably, the plaintiff seeks to challenge some action taken by the defendant.

**143.** Several Supreme Court decisions have discussed the relationship between dismissal for failure to comply with court orders and the due process clause. *See Societe Internationale v. Rogers, supra* note 103, 357 U.S. at 212, 78 S.Ct. at 1095. (under due process clause, party who failed to obey discovery order could not be dismissed where failure was "due to inability, and not to willfulness, bad faith, or any fault of petitioner"); *Hammond Packing Co. v. Arkansas*, 212 U.S. 322, 29 S.Ct. 370, 53 L.Ed. 530 (1909) (due process not denied when defendant's failure to comply with statute requiring production of material evidence leads to striking of answer and default); *Hovey v. Elliott*, 167 U.S. 409, 17 S.Ct. 841, 42 L.Ed. 215 (1897) (due process was denied to party who was dismissed as punishment for failure to comply with court order requiring deposit of money). *See also* Note, *supra* note 85, 91 Harv.L.Rev. at 1041–1044; note 160 *infra*.

**144.** Balancing tests have also been used in other membership list cases. *See, e.g., Bates v. City of Little Rock, supra* note 140, 361 U.S. at 527, 80 S.Ct. at 418; *Doe v. Martin, supra* note 140; *Familias Unidas v. Briscoe, supra* note 140, 544 F.2d at 192; *Hastings v. North East Independent School District, supra* note 140. *Familias Unidas* and *Hastings*, in which plaintiffs claimed a First Amendment privilege, are

discussed in more detail below, *see* text and notes at notes 147–148 *infra*. *Cf. Buckley v. Valeo*, 424 U.S. 1, 71–75, 96 S.Ct. 612, 659–661, 46 L.Ed.2d 659 (1976) (minor political parties likely to be harassed need not comply with statutory disclosure requirements). In *Buckley v. Valeo* the Supreme Court stated:

> We have long recognized that significant encroachments on First Amendment rights of the sort that compelled disclosure imposes cannot be justified by a mere showing of some legitimate governmental interest. Since *NAACP v. Alabama* we have required that the subordinating interests of the State must survive exacting scrutiny. We have also insisted that there be a "relevant correlation" or "substantial relation" between the governmental interests and the information required to be disclosed. * * *

424 U.S. at 64, 96 S.Ct. at 656 (footnotes omitted).

**145.** *See also Riley v. City of Chester*, 612 F.2d 708, 715–716 (3d Cir. 1976); *Silkwood v. Kerr-McGee Corp.*, 563 F.2d 433, 436–438 (10th Cir. 1978); *Baker v. F & F Investment*, 470 F.2d 778, 783 (2d Cir. 1972), *cert. denied*, 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973); *Cervantes v. Time, Inc.*, 464 F.2d 986 (8th Cir. 1972); *Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 725 (5th Cir. 1980).

in the language of the opinions suggests that the proper approach varies depending on whether the plaintiff or the defendant is seeking constitutional protection.[146]

In fact, a balancing approach has been adopted in cases very similar to this one, where the plaintiff has asserted a First Amendment privilege and refused to make discovery. In *Familias Unidas v. Briscoe*, 544 F.2d 182 (5th Cir. 1976), the plaintiff, an association formed to advance the educational and social status of Mexican-Americans, challenged the constitutionality of a state educational code provision that would have required it to disclose its membership. The association refused to answer three interrogatories from the school board that asked for the names of its members. The District Court, which adopted an automatic waiver theory, ordered disclosure and then dismissed when the association refused to comply with the order. The Fifth Circuit reversed, stating:

> To require them to forfeit that which they seek to protect in order that they might receive federal assurance that they were indeed entitled to it initially would be an abdication by the federal court of not only its federal stature, but its judicial robes as well.

The language of *N.A.A.C.P. v. Alabama, supra,* is much too strong to permit this result. * * * [W]e cannot agree with the trial court's distinction of that case on the basis that the N.A.A.C.P. was the defendant there. * * *

*Id.* at 192. The court then balanced the plaintiff's interest in protecting the names of the association's members against the state's need for the information and ruled against disclosure.[147] Similarly, in *Hastings v. North East Independent School District,* 615 F.2d 628 (5th Cir. 1980), the Fifth Circuit reversed a District Court order dismissing a plaintiff teachers organization when it refused to release the names of its members who were not publicly known. The court stated that on remand the District Court should weigh the defendant's need for the names of the members against the plaintiff's constitutional interests before ordering disclosure or imposing additional sanctions.

■ Balancing one party's First Amendment interests against another party's need for disclosure to determine whether a claim of privilege should be upheld or whether discovery should be ordered requires a detailed and painstaking analysis. The need for First Amendment protection should be carefully scrutinized. *See NAACP v. Alabama, supra,* 357 U.S. at 460–462, 78 S.Ct. at 1170–1171; *National Right to Work, supra,* 590 F.2d at 1152. The argument in favor of upholding the claim of privilege will ordinarily grow stronger as the danger to rights of expression and association increases. We emphasize, however, that the litigant seeking protection need not prove

---

**146.** It is true that in *Anderson v. Nixon, supra* note 141, a reporter's privilege case, the court stated that balancing was unrealistic where the plaintiff claimed First Amendment protection. As we noted earlier, however, the facts of that case reveal that the court refused to uphold the plaintiff's assertion of a privilege only after concluding that the defendant's need for the information sought was substantial. *See* note 141 *supra.*

**147.** Appellees suggest that *Familias Unidas v. Briscoe, supra* note 140, can be distinguished on the ground that the position of the Mexican-American organization was more analogous to that of a defendant than a plaintiff; it filed a suit challenging the constitutionality of the statute in order to forestall a criminal prosecution under the statute. The Fifth Circuit apparently did not believe this factor was important.

In *Hastings v. North East Independent School District, supra* note 140, it upheld the plaintiff's claim of privilege, even though plaintiff's position was not clearly analogous to that of a defendant. *See* description of *Hastings* in text and note at note 148 *infra.* We also are unpersuaded by this distinction. To rule that a plaintiff's claim of privilege should be upheld only when the plaintiff can be viewed as a quasi-defendant would be to give credence to the notion that the plaintiff, as a voluntary litigant, deserves less constitutional protection. But we have already rejected this view. *See* text and notes at notes 141–142 *supra.* In any event, a rule that would require us to determine whether a plaintiff's position could be analogized to that of a defendant would be extremely difficult to apply.

to a certainty that its First Amendment rights will be chilled by disclosure. It need only show that there is some probability that disclosure will lead to reprisal or harassment.[148]

 The interest in disclosure should also be carefully examined. Several factors are relevant in conducting this examination. First, courts must consider the relevance of the information sought. The interest in disclosure will be relatively weak unless the information goes to "the heart of the matter," that is, unless it is crucial to the party's case. See Zerilli v. Smith, supra, 656 F.2d at 713; National Right to Work, supra, 590 F.2d at 1153; Carey v. Hume, supra, 492 F.2d at 636.[149] Mere speculation that information might be useful will not suffice; litigants seeking to compel discovery must describe the information they hope to obtain and its importance to their case with a reasonable degree of specificity. See Cervantes v. Time, Inc., 464 F.2d 986, 994 (8th Cir. 1972). Second, courts must determine whether the litigants seeking disclosure have pursued alternative sources. Even

when the information sought is crucial to a litigant's case, disclosure should be compelled only after the litigant has shown that he has exhausted every reasonable alternative source of information. National Right to Work, supra, 590 F.2d at 1153.[150] Because of the preferred position of First Amendment rights, "compelled disclosure * * * [is] normally the end, and not the beginning, of the inquiry." Zerilli v. Smith, supra, 656 F.2d at 713 (quoting Carey v. Hume, supra, 492 F.2d at 638). Infringement of First Amendment interests must be kept to a minimum.

 On the basis of our review of the record, we cannot conclude that the District Court properly applied these principles in deciding that the claim of privilege should be denied and that disclosure should be ordered. In its August 6 order it stated: "Plaintiff cannot assert this privilege and at the same time proceed with this lawsuit, withholding information vital to the defense of the parties sued."[151] Later, in its order dismissing the Party, it stated: "These may well be the individuals able to

148. See Hastings v. North East Independent School District, supra note 140, 615 F.2d at 632 (First Amendment interests recognized as deserving substantial protection where complaint alleges that members of teachers organization had been harassed); NAACP v. Alabama, 357 U.S. 449, 462, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958) ("Petitioner has made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of physical hostility.").

In Buckley v. Valeo, supra note 144, 424 U.S. at 72–73, 96 S.Ct. at 660, the Supreme Court discussed the circumstances under which a minor party could avoid a statutory requirement that it disclose its membership list. Recognizing that strict requirements of proof of harassment would impose a heavy burden, it stated:

Minor parties must be allowed sufficient flexibility in the proof of injury to assure a fair consideration of their claim. The evidence offered need show only a reasonable probability that the compelled disclosure of a party's contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties. * *

Id. at 74, 96 S.Ct. at 661.

149. See also, e.g., Hastings v. North East Independent School District, supra note 140, 615 F.2d at 632 (emphasizing fact that defendants' need for membership list had evaporated once plaintiffs withdrew class action); Familias Unidas v. Briscoe, supra note 140, 554 F.2d at 192 (same); Baker v. F & F Investment, supra note 145, 470 F.2d at 783 (upholding reporter's privilege in part because information sought was not important).

150. See also Zerilli v. Smith, 656 F.2d 705, 713 (D.C. Cir. 1981); Carey v. Hume, 492 F.2d 631, 639 (D.C. Cir.), cert. dismissed, 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974); Riley v. City of Chester, supra note 145, 612 F.2d at 717–718; Silkwood v. Kerr-McGee Corp., supra note 145, 563 F.2d at 430; Baker v. F & F Investment, supra note 145, 470 F.2d at 784; Miller v. Transamerican Press, Inc., supra note 145, 621 F.2d at 726. In Carey we suggested that an alternative requiring the taking of as many as 60 depositions might be a reasonable prerequisite to compelled disclosure. Carey v. Hume, supra, 492 F.2d at 639.

151. Opinion and Order of August 6, 1979 at JA 853.

provide defendants with the information necessary for their defense—even to the point of telling them what exactly they are accused of doing." [152]

These statements might be interpreted as suggesting that the District Court intended to apply a balancing approach. Clearly, however, they do not reflect the careful analysis that is necessary before an order compelling disclosure should be made. The court never specifically addressed the question whether the Party's fears of harassment and interference with First Amendment rights were substantial.[153] As for the

other side of the balance, the court simply accepted appellees' claims that the undisclosed names were crucial, even though appellees had never stated precisely what information they hoped the unnamed individuals would provide.[154] The court also failed to consider the possibility that alternative sources might be able to provide the information sought.[155] In particular, it failed to recognize that appellees might be able to obtain the information they needed from the individuals that the Party had already named. If appellees really were uncertain about what they were accused of doing, for example, it seems likely that they could

**152.** Memorandum and Order of January 25, 1980 at JA 1134.

**153.** The record as it now stands does suggest that the Party deserves some First Amendment protection. The general importance of associational freedoms was stressed by the Supreme Court in *NAACP v. Alabama, supra* note 148. The Party claims that these freedoms might be endangered if the names of its leaders and members not known to the public are disclosed. It alleges that its members have been harassed before, and suggests that this harassment may continue. The complaint states, for example, that FBI agents still take down the names and license numbers of persons who visit the home of Elaine Brown. Amended Complaint at JA 37. Appellees respond by stating that, even if they took steps to suppress the Party in the past, these efforts have been discontinued and there is no current threat. We will not resolve this dispute here; the District Court should further explore these issues before reaching its decision on the privilege question. We note, however, that the Party has made serious allegations, and there is some evidence supporting its claims. We also emphasize that protection should not be denied simply because the Party cannot prove to a certainty that intimidation will follow. *See* text and note at note 148 *supra.*

**154.** Appellees have never suggested that the undisclosed identities are themselves linked to a specific issue in the case. *Cf. National Right to Work, supra* note 82, 590 F.2d at 1152–1153 (identity of right-to-work organization supporters sought because union hoped to show that they were interested employers).

Appellees do contend that they need the information in order to find out "what exactly they are accused of doing." *See* Memorandum and Order of January 25, 1980 at JA 1134. But it is unclear why this need would justify overriding the Party's First Amendment interests. It may be true that appellants do not describe their claims with perfect specificity. But they

have repeatedly stated that they hope to develop their claims after an opportunity to take discovery. Appellants have provided enough information in their complaint and responses to interrogatories to enable appellees to proceed with preparation of their defense. With respect to the allegation that the government conducted unlawful armed raids, for example, appellants have provided a great deal of specific information: they have listed 39 raids, five incidents of arson or bombing of Party offices, violent deaths of 15 Party members, five injuries, and 105 arrests. *See* JA 156–158, 895, 963, 965–967, 1047–1049, 1112. *See also* appellants' brief at Appendix A (detailing specific information provided by Party that substantiates allegations made in complaint).

To further support their claim of need appellees also suggest that unidentified Party officers could "provide testimony with respect to the Party's alleged political and social purposes" and "with respect to whether there really was any 'immediacy and reality' to plaintiffs' claim of threatened harm so as to justify imposition of equitable relief * * *." Appellees' brief at 45 n.65. But they fail to explain why this information could not be obtained from the Party officers who have already been named. *See also* text and note at note 156 *infra.*

**155.** *Cf. National Right to Work, supra* note 82, 590 F.2d at 1152–1153 (disclosure order reversed, even though right-to-work foundation's membership list was of central relevance, because plaintiff unions failed to show that they had been unable to obtain information from alternative sources); *Zerilli v. Smith, supra* note 150, 656 F.2d at 714–715 (District Court order refusing to require disclosure upheld even though the identity of reporter's source is crucial, because plaintiff failed to pursue alternatives).

have obtained helpful information from the Party members whose identities had been disclosed.[156]

We remand so that the District Court may reconsider its decision to order disclosure in light of the principles we have outlined above. If appellees cannot show that their need for the undisclosed identities is substantial, and the court concludes that the claim of privilege should have been upheld, the Party should be reinstated. If, on the other hand, the court decides that the claim of privilege was properly denied, then it may enter a new order requiring the Party to respond. If the Party fails to comply with this order, sanctions may be appropriate. We point out, however, that sanctions should be carefully tailored to preserve to the greatest extent possible the First Amendment values at stake. Again, dismissal should be used only as a last resort.

## IV. DISMISSAL OF HUEY NEWTON: THE FIFTH AMENDMENT PRIVILEGE

Huey Newton claimed the Fifth Amendment privilege against self-incrimination and refused to answer a number of interrogatories that would have required him to disclose information relating to matters that were the subject of pending criminal prosecutions or pending criminal and civil investigations.[157] In its August 6 order the District Court ruled that Newton must either answer the interrogatories with respect to which he had asserted the Fifth Amendment privilege or face dismissal. When Newton continued to rely on the privilege, he was dismissed. We cannot determine on the basis of the record as it now stands whether the District Court's August 6 decision denying Newton's claim of privilege and compelling disclosure was valid. We remand so that the District Court may reconsider its decision to order disclosure in

---

**156.** As appellants point out, see appellants' brief at 31 n.1, 22 members of the Central Committee were identified. See JA 95–96, 877, 932–933, 999. All but five of these individuals joined the Party before 1971, JA 863, and thus were members during the period that appellees consider to be most important to their defense. In fact, most of these individuals were Central Committee members during the period 1966–1971. JA 863. We think it likely that appellees could obtain the information they seek by deposing these individuals. Indeed, the individuals whose identities have not been disclosed may be far less valuable sources of information. The Party asserts that the four present Central Committee members whose names were withheld were not Central Committee members before 1973.

**157.** Newton refused to answer Interrogatories 11–15 and 49, which sought information about the "Fox Lounge incident" in July 1974. Allegations regarding events at the Fox Lounge are made at subparagraph 57(d) of the Amended Complaint, see JA 38. According to Newton, these events are currently the subject of a criminal prosecution against him. Objections of Plaintiff Huey Newton to First Interrogatories of Federally Represented Defendants at JA 240. Newton refused to answer Interrogatories 18–36 and 38–41, which sought information regarding his tax dealings. He objected on the ground that he was under investigation for possible civil and criminal violations of the federal tax laws. See id. at JA 241. Subparagraph 57(e) of the Amended Complaint suggests that

these investigations were undertaken for the purpose of harassing Newton. Amended Complaint at JA 38. Newton also refused to answer Interrogatory 45, which asked him to describe his involvement in the "Richmond incident" of October 1977 where three men, including two Black Panther Party members, broke into a house where a prosecution witness was staying and fired guns. He stated that this matter was the subject of a pending criminal investigation. Appellees suggest that this interrogatory relates to subparagraph 59(c) of the Amended Complaint, which states that Newton opposed violence except in self-defense. See Statement of Defendants Bell, et al., Interrogatories Sought to be Compelled at JA 808; Amended Complaint at JA 43. Finally, Newton refused to answer Interrogatories 46, 47, and 48, which sought information regarding the shooting of Nelson Malloy and the Party status of Flores Forbes. See JA 248–249.

Newton also objected to Interrogatories 43 and 44, which asked him to describe his participation in the shooting of Kathleen Smith and the beating of Preston Collins. Newton asserted the Fifth Amendment privilege against self-incrimination on the ground that this incident was the subject of a pending criminal prosecution against him. He later answered these interrogatories when the charges against him were dismissed. See Plaintiff Huey P. Newton's Further Supplemental Responses to Interrogatories as Ordered by This Court on August 6, 1979 at JA 991–992.

light of the legal principles we set forth below.

Just as appellees argued that an automatic waiver rule should be applied in the First Amendment context, so also they contend that such a rule should be applied in the Fifth Amendment context. Again, we disagree. In *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), the Supreme Court recognized that penalizing assertion of the Fifth Amendment privilege effectively destroys the privilege. Thus it held that the judiciary may not impose sanctions that make assertion of the privilege "costly." *See also Spevack v. Klein*, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967); *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).[158] Requiring a plaintiff to choose between proceeding with his lawsuit and claiming the privilege clearly imposes a substantial cost. This cost cannot be justified on the sole ground that the plaintiff chose to initiate the suit and thus can be characterized as a voluntary litigant. Again, an individual "voluntarily" becomes a plaintiff only because he believes the courts provide the best means of protecting his rights.[159] Indeed, as we noted in the First Amendment context, an automatic waiver rule raises serious due process questions; the plaintiff is in effect deprived of his day in court.[160] Our conclusion that a *per se* waiver rule cannot be justified is supported by decisions in other circuits. *See Campbell v. Gerrans*, 592 F.2d 1054 (9th Cir. 1979) (proper exercise of Fifth Amendment rights by plaintiff in discovery stage of civil case can never justify automatic dismissal); *Wehling v. Columbia Broadcasting System*, 608 F.2d 1084 (5th Cir. 1979) (same); *Thomas v. United States*, 531 F.2d 746 (5th Cir. 1976) (there are "constitutional limitations upon the power of courts, even in aid of their own valid processes, to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause").[161]

**158.** The fact that the privilege was asserted in a civil setting does not justify a waiver rule. It is well established that the privilege may be claimed whenever there is a danger of criminal prosecution. *See, e. g., McCarthy v. Arndstein*, 266 U.S. 34, 40, 45 S.Ct. 16, 17, 69 L.Ed. 158 (1924).

**159.** *See* text and notes at notes 141–142 *supra; see also* Note, *Plaintiff as Deponent: Invoking the Fifth Amendment, supra* note 142, 48 U.Chi.L.Rev. at 162–164 (criticizing voluntary/involuntary distinction); Note, *Toward a Rational Treatment of Plaintiffs Who Invoke the Privilege Against Self-Incrimination During Discovery, supra* note 142, 66 Iowa L.Rev. at 584–587 (same).

**160.** *See* text and note at note 193 *infra. See also Wehling v. Columbia Broadcasting System, supra* note 142, 608 F.2d at 1088 (automatic dismissal for assertion of Fifth Amendment privilege would be unconstitutional because due process requires judicial determination of plaintiff's civil action); *Thomas v. United States*, 531 F.2d 746, 749 (5th Cir. 1976).

If an automatic waiver rule were applied, the civil rights of any individuals vulnerable to criminal prosecution would be routinely denied.

For example, no one would be able to bring suit for police brutality if on deposition he were required to elect between incriminating himself with regard to the incident out of which the claims arose, and suffering dismissal.

Note, *Plaintiff as Deponent: Invoking the Fifth Amendment, supra* note 142, 48 U.Chi.L.Rev. at 163–164 (footnote omitted). A similar problem could arise with respect to gambling tax refund actions. If dismissal were automatic, the government could routinely abuse its power to assess by "filing interrogatories framed to oblige the taxpayer to incriminate himself or forego his lawsuit. * * * [D]ismissal of every suit for wagering tax refund by every taxpayer who invokes his Fifth Amendment right may be akin to forfeiture." *Thomas v. United States, supra*, 531 F.2d at 749.

**161.** *But see Penn Communications Specialties, Inc. v. Hess*, 65 F.R.D. 510 (E.D.Pa.1975) (automatic dismissal); *Bramble v. Kleindeinst*, 357 F.Supp. 1028, 1036 (D.Colo.1973), *aff'd*, 498 F.2d 968 (10th Cir.), *cert. denied*, 419 U.S. 1069, 95 S.Ct. 656, 42 L.Ed.2d 665 (1974) (same); *Brown v. Ames*, 346 F.Supp. 1176 (D.Minn. 1972) (same); *see also Franklin v. Franklin*, 365 Mo. 442, 283 S.W.2d 483 (1955) (party's refusal to answer questions justifies striking pleadings in divorce action).

Several of the above cited opinions relied on *Lyons v. Johnson*, 415 F.2d 540 (9th Cir. 1969), *cert. denied*, 397 U.S. 1027, 90 S.Ct. 1273, 25 L.Ed.2d 538 (1970). In that case the Ninth Circuit approved dismissal of a plaintiff who invoked the Fifth Amendment in response to questions asked at a deposition. It stated that the "scales of justice would hardly remain equal * * * if a party can assert a claim

In our view, a balancing approach is clearly preferable, since it gives far greater protection to plaintiffs' Fifth Amendment rights. Under this approach the claim of privilege should be upheld unless the defendant can show that his need for the information in question is substantial. Even in circumstances where the defendant has demonstrated a strong interest in disclosure, an order requiring the plaintiff to choose between his Fifth Amendment rights and dismissal will not be proper, except where other, less drastic, remedies are not available.[162]

Use of a balancing test is not unprecedented in the Fifth Amendment context.[163] In fact, in *Wehling v. Columbia Broadcasting System, supra,* the Fifth Circuit explicitly adopted a balancing analysis to determine whether a plaintiff could invoke the Fifth Amendment and refuse to answer interrogatories.[164] In that case the plaintiff brought a libel action after the defendant had broadcast a radio program in which it was alleged that the plaintiff had abused federal loan programs. The plaintiff invoked the Fifth Amendment at a deposition in response to questions about the loans. The lower court dismissed. The Fifth Circuit reversed, holding that the plaintiff's assertion of the privilege could not justify automatic dismissal. It stated that "a civil plaintiff has no absolute right to both his silence and his lawsuit. Neither, however, does the civil defendant have an absolute right to have the action dismissed anytime a plaintiff invokes his constitutional privilege." 608 F.2d at 1088. It went on to hold that by measuring the relative weights of the competing interests the courts could afford better protection to both parties. The court emphasized that in conducting this balance dismissal should be the last rather than the first step.

> When plaintiff's silence is constitutionally guaranteed, dismissal is appropriate only where other, less burdensome, remedies would be an ineffective means of preventing unfairness to defendant.

*Id.* The Fifth Circuit then applied the balancing test to the facts before it. It recognized that the information sought by the defendants went to the heart of their case. But it decided that the balance tipped toward the plaintiff, and that all discovery should be stayed for three years until the statute of limitations on the potential criminal prosecutions had run.

---

against another and then be able to block all discovery attempts against him by asserting a Fifth Amendment privilege to any interrogation whatsoever upon his claim." *Id.* at 542. When it decided *Campbell v. Gerrans,* however, the Ninth Circuit expressly limited the holding of *Lyons v. Johnson* to situations in which the Fifth Amendment had not been properly invoked. *Campbell v. Gerrans,* 592 F.2d 1054, 1057 (9th Cir. 1979). In *Johnson v. Lyons* the court had suggested that there was no real danger of self-incrimination.

**162.** *See* Note, *Toward a Rational Treatment of Plaintiffs Who Invoke the Privilege Against Self-Incrimination During Discovery, supra* note 142, 66 Iowa L.Rev. at 594–602 (advocating adoption of balancing test).

**163.** In *California v. Byers,* 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971), it was claimed that a California statute requiring a driver involved in an accident to stop and identify himself violated the Fifth Amendment. Chief Justice Burger, writing for the plurality, suggested that the Fifth Amendment claim could be decided by balancing the constitutional right against the interest in truth finding. *Id.* at 427, 91 S.Ct. at 1537. The plurality eventually upheld the statute on another ground. But Justice Harlan, who concurred, found that the strong state interest in identifying those involved outweighed what he argued was a minor infringement of the privilege. Implicit balancing may underlie the evolution of the "required records" doctrine. *Compare, e. g., Shapiro v. United States,* 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948) (rejecting claim that individual could not be required to keep possibly incriminating records under Emergency Price Act of 1942), *with Marchetti v. United States,* 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968) (invalidating special filing for a tax on gamblers on the ground that it violated the privilege against self-incrimination). These decisions might be explained on the ground that the Court was balancing the government's need for information against the potential harm to the individual if the information was produced.

**164.** In its earlier decision discussing the privilege, *Thomas v. United States, supra* note 160, the Fifth Circuit did not explicitly adopt a balancing test. Although the Ninth Circuit rejected the automatic waiver rule in *Campbell v. Gerrans, supra* note 161, it did not explicitly adopt a balancing test.

On the basis of our review of the record, we cannot determine whether the District Court properly applied these legal principles when it entered an order requiring Newton to choose between disclosure and dismissal. In reviewing Newton's claim of privilege the court made statements virtually identical to those it made in dismissing the Party. It observed that appellees had contended that the information withheld by Newton "is vital to their defense, many times to the point of telling them what exactly they are accused of doing." [165] This language might be interpreted as showing that the court intended to apply a balancing test. Even if this interpretation is correct, however, it is clear that the court did not undertake the careful analysis that is necessary before a claim of privilege can be denied.

First, the court never considered whether there was a serious threat to Newton's Fifth Amendment rights. The record as it now stands strongly suggests that Newton properly invoked the privilege against self-incrimination. Although appellees make several arguments in an attempt to show that Newton's invocation of the Fifth Amendment should not be respected, these arguments lack merit. [166] Appellees contend, first, that Newton's claims involve no more than "imaginary hazards of incrimination." [167] But Newton declined to answer the interrogatories in question precisely because they would have required him to disclose information about incidents that are the subject of pending criminal prosecutions or pending criminal and civil investigations. [168] Newton concedes that the civil investigation has now been completed. However, that investigation did not termi-

nate until after appellees had filed their motion for sanctions and Newton had filed his original and supplemental responses. [169] Second, appellees suggest that Newton refused to answer several interrogatories that would have required him to identify participants in events that are the subject of criminal prosecutions in part because he wished to protect those individuals; they argue that this is not a proper claim of privilege. But as appellants correctly point out, identification of potential witnesses is within the scope of the Fifth Amendment privilege. Finally, appellees claim that Newton has already waived his privilege because he testified about many of these issues in an unrelated criminal trial. However, a waiver of the privilege against self-incrimination is effective only in the proceedings at which the accused testifies. *See, e.g., United States v. Miranti*, 253 F.2d 135 (2d Cir. 1958); *Marcello v. United States*, 196 F.2d 437, 444–445 (5th Cir. 1952); *see generally* C. McCormick, Law of Evidence § 132 at 281 (1972).

On the other side of the balance, appellees have not made the detailed showing of need that would justify an order forcing a party to choose between disclosure and dismissal. Appellees have contended that the information is crucial "to the point of telling them what exactly they are accused of doing." [170] But the record does not now provide much support for this contention. In fact, as appellants emphasize, the Fifth Amendment claims seem to relate only to a small portion of the lawsuit; the interrogatories Newton refused to answer pertained primarily to allegations contained in three subparagraphs of the complaint. [171] It may

---

**165.** Opinion and Order of August 6, 1979 at JA 856.

**166.** It is relevant to note that the District Court never suggested that Newton's claim of Fifth Amendment privilege was not substantial.

**167.** Appellees' brief at 37–38.

**168.** *See* note 157 *supra.*

**169.** *See* appellants' reply brief at 31 n.1. The tax investigation was not settled until Novem-

ber 29, 1979. *See* appendix to appellees' brief (decision of Tax Court).

**170.** *See* Opinion and Order of August 6, 1979 at JA 856.

**171.** *See* note 157 *supra.* These subparagraphs are 57(d) ("Fox Lounge incident"), 57(e) (tax investigations initiated to harass Newton), and 59(c) ("Richmond incident" and Newton's claim that he advocated violent action only where necessary for self-defense). *See* Amended Complaint at JA 38, 43. The District Court

be true that if appellees are never able to obtain the withheld information they will be prejudiced. This does not necessarily mean, however, that at this stage of the litigation an order forcing immediate disclosure is appropriate. Far less drastic remedies would seem to be available. The court apparently never considered the possibility of delaying Newton's obligation to respond until the criminal prosecutions and investigations are terminated or until the relevant statutes of limitations have expired. Newton has repeatedly stated that he would be willing to answer the interrogatories once the danger of prosecution has passed.[172] In the meantime, appellees could proceed with discovery on other issues. It is instructive to compare the facts of *Wehling v. Columbia Broadcasting System, supra*, in which the Fifth Circuit stayed the plaintiff's obligation to respond for three years, even though the information sought by the defendants went to the heart of their case.[173]

We remand so that the District Court may reconsider its decision to deny the claim of Fifth Amendment privilege and to force Newton to choose between disclosure and dismissal in light of the balancing test we have just described. In conducting this balancing inquiry the court should consider whether an order delaying Newton's obligation to respond until the danger of criminal prosecution has passed would unduly prejudice appellees. If it finds that such an order would be appropriate, then Newton

should be reinstated and given another opportunity to pursue his claims. Even if the court finds that appellees need the information in question immediately, complete dismissal should be a last resort; the court might consider, for example, dismissing only that portion of Newton's suit that relates to the withheld information.[174]

## V. DISMISSAL OF OTHER INDIVIDUAL PLAINTIFFS AND AWARD OF COSTS AND ATTORNEY FEES

Appellants also challenge two District Court orders closely related to the decisions to dismiss the Party and Newton: (1) the order dismissing all other plaintiffs, and (2) the order requiring the Party and Newton to pay the expenses incurred by appellees in bringing their motion for sanctions.

### A. *Dismissal of Other Individual Plaintiffs*

In their motion for sanctions appellees did not seek dismissal of any of the plaintiffs other than the Party and Newton. In its order granting the motion the District Court referred only to "plaintiffs."[175] Thus, as we explained above, plaintiffs filed a motion for clarification, asking whether the court intended to dismiss only the Party and Newton, or whether it also intended to dismiss the other individual plaintiffs.[176] The court responded by filing an amended order and final judgment in which it stated that "defendants' motion to dismiss is here-

expressly found that the interrogatories inquire about more than the subjects of "several subparagraphs of the complaint." Memorandum and Order of January 25, 1980 at JA 1135. It may have intended to refer to Interrogatories 46, 47, and 48, which ask for information regarding the shooting of Nelson Malloy and the Party status of Flores Forbes. *See* JA 248–249.

**172.** *See, e.g.,* Plaintiff Huey P. Newton's Memorandum of Points and Authorities in Support of Motion to Compel Discovery, R 207A at 21, 26; Plaintiff Huey P. Newton's Further Supplemental Responses to Interrogatories as Ordered by This Court on August 6, 1979 at JA 991. In fact, when one of the criminal prosecutions ended in acquittal Newton did provide answers to two more interrogatories. *See id.* at JA 991–992 (responses to Interrogatories 43 and 44).

**173.** The information sought here does not seem to go to the heart of the lawsuit. Thus the defendants in this case will be far less hampered in preparing their case than the defendants in *Wehling.*

**174.** For example, the court could simply dismiss any claims that depend on the allegations contained in subparagraphs 57(d) and 57(e) of the Amended Complaint.

**175.** *See* Memorandum and Order of January 25, 1980 at JA 1138.

**176.** *See* Motion of Plaintiffs to Amend Judgment Pursuant to Rule 59(e) or, Alternatively, to Direct Entry of Final Judgment Pursuant to Rule 54(b) at JA 1139.

by granted" and that "all named plaintiffs to this action are hereby dismissed * * *."[177] We reverse the dismissal of the other plaintiffs.

The District Court failed to set forth any findings of fact or law supporting its determination that the other plaintiffs should be dismissed. However, appellees have offered two theories that they believe support this determination. First, they suggest that the claims of the other plaintiffs were contingent upon the claims of the Party and Newton. Thus, when the Party and Newton were dismissed, dismissal of the remaining plaintiffs was appropriate. But the other plaintiffs' claims are not contingent upon the claims of the Party and Newton. The complaint alleges that the defendants engaged in a continuing conspiracy against the Party, its members, and its supporters.[178] There is no reason why the other plaintiffs, as Party members and supporters, could not continue to litigate this claim, even though the Party and Newton are out of the case.

The second theory offered by appellees is that, although the District Court used the word "dismissal," it actually intended to grant a motion for summary judgment against all the other plaintiffs that appellees had filed roughly one year earlier. In this motion appellees claimed that summary judgment was appropriate because the other plaintiffs, unlike the Party and Newton, had only requested declaratory and injunctive relief. Appellees argued that there was no evidence showing any continuing harm, and that therefore equitable relief was unwarranted. Appellants responded to this motion by stating that their complaint

did allege the possibility of continuing harm, and by filing an affidavit of counsel pursuant to Rule 56(f) in which they asked that consideration of the motion be deferred until they had an opportunity to take further discovery.[179] Under Rule 56(f) the District Court may either deny a motion for summary judgment or postpone its decision when it concludes that additional discovery is necessary.[180] We do not agree with appellees that the District Court's amended order can be interpreted as granting their motion for summary judgment. The District Court nowhere refers to Rule 56 or to the motion. We will not affirm the District Court's dismissal on this basis.

Because appellees' efforts to salvage the amended order are unavailing, the other plaintiffs should be reinstated. They should be given an opportunity to pursue their claims even if the court determines on remand that the Party and Newton were properly dismissed. If we have misinterpreted the order, that is, if the court did in fact intend to grant the motion for summary judgment, it may simply enter a new order explicitly stating that the motion is granted. We would point out, however, that summary judgment may be premature. There appears to be considerable merit to appellants' argument that a continuance is appropriate under Rule 56(f); at this stage of the litigation appellants have not had sufficient opportunity to uncover evidence supporting their claim of continuing harm.[181] We note, for example, that the District Court never ruled on appellants' motion to compel production of documents by appellees.

**177.** Amended Order and Final Judgment, February 13, 1980, JA 1144. The individual plaintiffs affected by this order were Donald Freed, Berton Schneider, Thomas and Flora Gladwin, John George, and Father Earl Neil, all of whom were Party supporters. Also affected were John and Elizabeth Huggins, who were suing on behalf of their deceased son, John Huggins, a former Party member. *See* note 9 *supra.*

**178.** *See, e.g.,* Amended Complaint at JA 37.

**179.** *See* Plaintiffs' Memorandum of Points and Authorities in Opposition to Federally Repre-

sented Defendants' Motion for Partial Summary Judgment or in the Alternative for Sanctions, October 30, 1978, R 193A.

**180.** *See* note 33 *supra* (*quoting* text of Rule 56(f), Fed.R.Civ.P.).

**181.** *See also* text and notes at notes 188–195 *infra* (discussing need for further discovery on question whether summary judgment should be granted in favor of certain individual defendants).

### B. *Award of Attorney Fees and Costs*

■ In addition to dismissing all appellants, the District Court, acting pursuant to Rule 37(b) of the Federal Rules of Civil Procedure, ordered the Party and Newton to pay the reasonable expenses incurred by appellees in bringing their motion to dismiss under Rule 37(b), including costs and attorney fees. We reverse. Appellants need not pay appellees' expenses.

Rule 37(b) states that the court shall require a party failing to obey a discovery order made under Rule 37(a) to pay the reasonable expenses caused by the failure, "unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust."[182] In this opinion we have already ruled that the Party complied with that portion of the August 6 discovery order which required it to clarify apparently inconsistent or evasive responses. Thus there was no "failure to obey" that would trigger the expenses provision of Rule 37(b). We have also ruled that the portion of the order requiring all Party officers to respond to a list of 107 interrogatories was not valid. Thus, although the Party did fail to obey this ruling, the failure was clearly "substantially justified." In addition, we have held that the District Court should reconsider those portions of the August 6 discovery order which require the Party and Newton to choose between assertion of a constitutional privilege and dismissal. At this stage we cannot find that their refusal to release the withheld information was not substantially justified. Under the circumstances, any possible basis for an award of expenses under Rule 37(b) has evaporated.[183]

## VI. OTHER ISSUES

■ Appellants raise several other issues not directly related to the decision to dismiss and award costs. In particular, they challenge the District Court's decisions to: (1) grant partial summary judgment in favor of all individual defendants who held office after 1973; (2) deny appellants' motion for an extension of time in which to file for class certification; and (3) postpone consideration of appellants' motion to compel discovery until after consideration of appellees' motion to compel. Appellees contend that we may not reach these issues since the notice of appeal filed by appellants pursuant to Rule 3 of the Federal Rules of Appellate Procedure only referred to the orders granting dismissal and awarding expenses. Rule 3 provides that notice of appeal "shall designate the judgment, order or part thereof appealed from * * *." Rule 3(c), Federal Rules of Appellate Procedure. We are not persuaded by this argument.

■ The Supreme Court has rejected a strict construction of Rule 3. In *Foman v. Davis*, 371 U.S. 178, 181–182, 83 S.Ct. 227, 229–230, 9 L.Ed.2d 222 (1962), it held that an appeal should not be dismissed simply because the appellant failed to list all orders appealed from in its Rule 3 notice. In addition, this court has held that "when an appealable final judgment is entered, appeal brings up the entire record for review, including interlocutory orders." *Taylor v. Washington Terminal Co.*, 409 F.2d 145, 147 (D.C.Cir.), *cert. denied*, 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 85 (1969). If appellees would be prejudiced by a decision to consider issues not specifically included in the notice of appeal, our conclusion might be different. *See Gunther v. E. I. DuPont de Nemours & Co.*, 255 F.2d 710, 717 (4th Cir. 1958) ("appeal should not be dismissed for mistakes which do not mislead or prejudice the appellee"). They have not made such a

---

**182.** *See also* text and notes at notes 77–81 *supra* (describing Rule 37(b) in detail).

**183.** *Cf. Stillman v. Edmund Scientific Co.*, 522 F.2d 798 (4th Cir. 1975) (rule limits sanctions to fees and expenses flowing from an abuse of the discovery process); *Vollert v. Summa Corp.*, 389 F.Supp. 1348 (D.Hawaii 1975) (award for costs and attorney fees incurred in obtaining

order compelling answers to interrogatories was not justified where defendant had not acted in bad faith and objections had some foundation); *Johnson v. W. H. Stewart Co.*, 75 F.R.D. 541 (D.Okl.1976) (request for attorney fees and costs in connection with motion to compel is denied where there was some merit to defendant's objection to interrogatories).

showing, however. We note that the Joint Appendix includes all of the orders which appellants wish to challenge.[184]

### A. Summary Judgment in Favor of Individual Defendants Who Held Office After 1973

In July 1977 each of the individual appellees who took office after January 1974 moved for summary judgment on the ground that they were not in office at the times of the acts alleged. They filed affidavits setting forth the dates on which they assumed office and disclaiming any knowledge of or participation in a conspiracy against the appellants.[185] Appellants responded with an affidavit of counsel under Rule 56(f), stating that they needed further discovery before they could respond to appellees' motion for summary judgment.[186] They also claimed that the affidavits of three of the appellees, Postmaster General Benjamin Bailar, Attorney General Levi, and Internal Revenue Service Commissioner William Williams, raised new issues of material fact, since they seemed to concede involvement in investigations of Party activities.[187] Finally, appellants noted that their complaint alleged a continuing conspiracy, and described several overt acts occurring after January 1974.[188] In July 1978 the District Court granted the motion.

184. See JA 253, 629. Appellees also argue that these issues are not reviewable because appellants' counsel, in a letter to appellees' counsel dated April 25, 1980, provided a list of issues appellants intended to present on appeal, but did not include on this list the decision to grant summary judgment or the decision to defer consideration of the motion to compel. See addendum to appellees' brief (copy of letter). Appellees suggest that this letter should be treated as a designation of issues pursuant to Rule 30(b), Fed.R.App.P., which provides, in pertinent part:

> The parties are encouraged to agree as to the contents of the appendix. In the absence of agreement, the appellant shall, not later than 10 days after the date on which the record is filed, serve on the appellee a designation of the parts of the record which he intends to include in the appendix and a statement of the issues which he intends to present for review. * * *

We do not find, however, that the letter can be treated as a formal designation of issues pursuant to Rule 30(b). Even if the letter was so interpreted, we would review the issues not listed. Appellees have not shown how they are prejudiced; also, as we have stated, the Joint Appendix does contain the order granting summary judgment and the order deferring consideration of the motion to compel.

185. See Motion of Certain Defendants [Griffin Bell, W. Michael Blumenthal, Clifford Alexander, Stansfield Turner, Benjamin Bailar, Edward Levi, George Bush, William Simon, and William Williams] for Summary Judgment, July 14, 1977, R 56.

186. See appellants' Memorandum of Points and Authorities in Opposition to Motion of Certain Defendants for Summary Judgment, September 1, 1977, R 71 (affidavit of Bruce Terris).

187. See id. at 15–17. In his affidavit former Attorney General Levi acknowledges receiving information concerning the ongoing "domestic security investigation" of the Party and COINTELPRO operations. He goes on to state that he decided to terminate the investigation of the Party shortly after he took office. See Motion of Certain Defendants for Summary Judgment, R 56 (Levi Affidavit). Former Postmaster General Benjamin Bailar acknowledges that mail addressed to the Black Panther Party "may have been opened" under authority granted by federal statutes that permit opening of mail either pursuant to a search warrant or by a Postal Service employee for the purpose of determining an address to which the letter can be delivered. The affidavit does not state whether the Postal Service had search warrants or whether the mail was opened to ascertain delivery addresses. The affidavit also concedes that Black Panther Party publications were misclassified by the Postal Service, and that, as a result, the Party was charged excessive postage. There is no explanation as to why this occurred. See id. (Bailar Affidavit). Former Acting Commissioner of the IRS William Williams concedes in his affidavit that he participated in a meeting at which the status of Newton's tax investigation was discussed. He also stated that he discussed the Black Panther Party and individual members and supporters with former IRS Commissioner Donald Alexander. Id. (Williams Affidavit).

188. See Memorandum of Points and Authorities in Opposition to Motion of Certain Defendants for Summary Judgment, R 71 at 11–12. See also Amended Complaint at JA 34, 37 (government allocated funds in 1976 "to pay off informants and provacateurs [sic]") (FBI surveillance of Elaine Brown). Appellants also noted that, although COINTELPRO actions formally terminated in 1971, the Senate Report found that "COINTELPRO existed for years on an 'ad hoc' basis before the formal programs were instituted, and more significantly, COIN-

It stated that the post-1973 appellees' affidavits evidenced a lack of involvement in the acts alleged, and that the affidavits were substantiated by the recency of the terms of office. Moreover, appellants had failed to respond with evidentiary submissions of their own. The court recognized that appellants had filed an affidavit of counsel pursuant to Rule 56(f), but found that since that affidavit was submitted "plaintiffs have had ample opportunity to take * * * discovery and have taken discovery * * *." [189]

■ We reverse on the ground that appellants had not yet been given sufficient time to take discovery. When the motion was granted, discovery was still in the first "wave." In fact, appellants had received appellees' first response to their request for documents only three months earlier. The materials they received were highly disorganized.[190] Moreover, only three days before the order granting summary judgment was entered, appellants received an entirely new batch of documents.[191] Because appellants believed appellees' response was inadequate, they later decided to file a motion to compel discovery.[192] Under the circumstances, the District Court should have denied or at least postponed its decision on the motion for summary judgment. A central purpose of Rule 56(f) is to insure that diligent parties are given a reasonable opportunity to complete discovery and prepare their cases. *Committee for Nuclear Responsibility, Inc. v. Seaborg*, 463 F.2d 783 (D.C.Cir. 1971). *See also Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438 (2d Cir. 1980). Sufficient time for discovery is particularly important where crucial facts are in the control of the opposing party. *Washington v. Cameron*, 411 F.2d 705 (D.C.Cir. 1969). *See also Costlow v. United States*, 552 F.2d 560 (3d Cir. 1977).[193] Here, appellants have repeatedly stated their intent to rely on materials provided by the government through discovery to prove their claims of conspiracy.

Although we conclude that appellants should be given an opportunity to take further discovery, we are not convinced, on the basis of the record as it now stands, that they will be able to uncover any evidence implicating the post-1973 appellees. Almost all of the activities described in the complaint were alleged to have occurred before 1974. In fact, the FBI's operations under COINTELPRO were disbanded in 1971. The complaint does refer to two recent events: it alleges that the FBI continues to take the license plate numbers of all persons who visit Elaine Brown, and it states that in 1976 the government allocated funds "to pay off informants and provacateurs [*sic*]." [194] But these actions are not necessarily unlawful. It is also true that former Attorney General Edward Levi, former Postmaster General Benjamin Bailar, and former Acting IRS Commissioner William Williams concede that they participated in investigations of the Party.[195] There is no indication that their conduct was illegal, however. Under the circumstances, the District Court might consider establishing an expedited discovery schedule with respect to the claims against the post-1973 government officials. By expedi-

TELPRO-type activities may continue today under the rubric of 'investigation.' " Senate Report, *supra* note 19, Book III at 12; *see id.* at 13–14.

**189.** Order of July 27, 1978 at JA 253.

**190.** *See* text and note at note 44 *supra* (describing appellants' motion to compel production of documents by federal appellees).

**191.** *See* appellants' brief at 61; Memorandum of Points and Authorities in Support of Plaintiffs' Motion to Compel Discovery by Federal Defendants at JA 261.

**192.** Appellants' motion to compel was filed September 21, 1978, after the District Court granted the motion for summary judgment in favor of the post-1973 appellees. *See* Docket of Proceedings at JA 14–15.

**193.** *See generally* 10 C. Wright & A. Miller, Federal Practice and Procedure 2741 (1973) (discussing sufficiency of reasons for not presenting affidavits).

**194.** *See* Amended Complaint at JA 34, 37.

**195.** *See* note 187 *supra* (describing contents of affidavits).

ting discovery the court could ensure that these individuals will avoid any unnecessary involvement in further litigation.

### B. Motion for Extension of Time in Which to File for Class Certification

On March 11, 1977 appellants filed a motion for an extension of time in which to move for class certification.[196] Appellees opposed that motion on the ground that under Local Rule 1–13(b) of the Rules of the District Court for the District of Columbia motions for class action certification must be filed within 90 days of the time the complaint is filed.[197] Here, the complaint was filed on December 1, 1977. Thus the time for moving to certify a class had expired 11 days prior. According to appellees, since the time for moving to certify a class had expired, motions for extensions of time in which to file for certification were also precluded. The District Court agreed, and refused to grant an extension.[198] We affirm.

■ Appellants failed to offer any compelling reasons why the local rule should not be followed. In their motion appellants argued, first, that "[r]esearch into the facts which will determine the extent of the alleged class is extremely time-consuming and is still underway."[199] But ongoing research need not have precluded a timely motion for class certification. At least as a preliminary matter, the definition of the proposed class that was provided in the complaint would have been sufficient for purposes of a motion for class action certification. Second, appellants argue that a motion was not yet appropriate because the complaint had not yet been served on appel-

lees, and because the government had received an extension of time in which to respond to the complaint.[200] But this excuse is unavailing. It is instructive to compare *Coffin v. Sec'y of Health, Educ., and Welfare*, 400 F.Supp. 953 (D.D.C.1975) (three-judge court), where class action certification was denied for failure to comply with Local Rule 1–13(b). In that case the court rejected a claim that plaintiff should not be held to the 90-day limit because defendants had filed motions to dismiss, to dissolve the three-judge court, and to transfer the case, and the class action certification issue could not be resolved until those motions were decided. We also point out that strict enforcement of Local Rule 1–13(b) implements the policy of Rule 23(c)(1) of the Federal Rules of Civil Procedure, which states that the status of class actions should be determined quickly. Moreover, this was not a situation where appellants had failed to "beat the clock" by a few hours.[201]

### C. Decision to Delay Consideration of Appellants' Motion to Compel Production of Documents by Appellees

■ Appellants claim that the District Court abused its discretion when it decided to postpone consideration of their motion to compel production of documents by appellees. As a result of this postponement, appellants argue, the District Court decided the motions to compel further responses to interrogatories and to dismiss without considering appellees' misbehavior. Appellants suggest that, particularly where the court was deciding whether dismissal of their case was appropriate, the conduct of appellees was relevant. Appellees respond by

---

**196.** *See* Motion for Enlargement of Time in Which to Move for Class Action Certification, R 11.

**197.** *See* Federal Defendants' Points and Authorities in Opposition to Plaintiffs' Motion for Enlargement of Time in Which to Move for Class Action Certification, R 12. *See also* note 28 *supra* (*quoting* text of Local Rule 1–13(b)).

**198.** *See* Order of May 26, 1977 at JA 56.

**199.** *See* Memorandum of Points and Authorities in Support of Plaintiffs' Motion for En-

largement of Time in Which to Move for Class Action Certification, R 11.

**200.** *Id.*

**201.** *See* Order of May 26, 1976 in *Gutmann v. Middendorf*, D.C. Civil Action No. 75–1883 (attachment to Federal Defendants' Points and Authorities in Opposition to Plaintiffs' Motion for Enlargement of Time in Which to Move for Class Action Certification, R 12).

arguing that the District Court has broad discretion to manage the timing of discovery. Because we reverse the dismissal and remand for further proceedings, we need not resolve this dispute. We believe, however, that there is some merit in appellants' position. When a court is deciding whether to impose sanctions on one party, the behavior of the other party deserves some consideration. On remand, if the District Court is confronted with new motions for sanctions by appellees, it should examine their conduct before making its decision.

## VII. CONCLUSION

We reverse the District Court's order dismissing the Black Panther Party and Huey Newton. The case is remanded so that the court may reconsider its decision to deny their claims of constitutional privilege in light of the legal principles outlined in this opinion. If the court decides that the claims of privilege should have been upheld, both the Party and Newton should be reinstated. We also reverse the dismissal of the other named plaintiffs. Regardless of the court's decision regarding the Party and Newton, these individuals should be reinstated and given another opportunity to pursue their claims. We reverse the decision to award expenses to appellees: because we conclude that the dismissals were inappropriate, the basis for that award has evaporated. And we reverse the District Court's decision to award summary judgment in favor of the individual appellees who held office after 1973, since we do not find that appellants have had sufficient opportunity to take discovery. We affirm the District Court's decision to deny appellants' motion for an extension of time in which to file for class action certification. The individual appellants may not press claims on behalf of the classes described in their complaint.

Although we believe this action should go forward, we admonish all parties to do their utmost to ensure that this suit proceeds expeditiously. We hope that, particularly when the parties seek further discovery, there will be more cooperation and less acrimony. No reason appears why this case, given a good faith effort by all parties, cannot proceed to a responsible conclusion.

*Affirmed in part, reversed in part, and remanded with instructions.*

MacKINNON, Circuit Judge (concurring in part and dissenting in part).

The Black Panther Party and its co-plaintiffs seek $100 million in compensatory and punitive damages from a number of former and present United States officials and employees who, beginning in 1967, allegedly participated in a covert action program (code named COINTELPRO) designed to destroy the Black Panther Party. COINTELPRO was started in the wake of the "long hot summer of 1967," when internal violence in the United States reached epidemic proportions and law enforcement agencies and national guard units throughout the nation were severely taxed to combat mass violence, arson, wholesale looting and constant threats to law and order—particularly in the large cities. At that time the Director of the Federal Bureau of Investigation labelled the Black Panther Party "the greatest threat" to the internal security of the United States. S.Rep.No. 755, 94th Cong., 2d Sess., Book III, 187 (1976).

Following an investigation, by a Select Committee, Senator Church, Chairman, the Committee Report in 1976 revealed the details of several COINTELPRO programs, including one that was directed at the Black Panther Party and that allegedly violated the constitutional rights of the Party and its members. *Id.* at 187–223. The report does not constitute evidence.

Following the release of the Committee Report, this lawsuit was started on December 1, 1976.[1] Since that date, the parties have engaged in a series of extensive discovery efforts that have brought the case to

---

1. An Amended Complaint was filed March 31, 1977. Attorney General Levi filed an Answer on June 21, 1977.

its present procedural status as described in Judge Wright's opinion. In sum, the discovery efforts on both sides have been continuing for over three years and the end is not yet in sight. Neither is full disclosure. The district court was understandably concerned about accelerating the speed of full discovery in this case, but I agree with the majority that dismissal, at the present stage of the case, was too harsh a sanction for the Party's initial refusal to comply with the discovery orders. I thus concur in the remand and the court's order, but only to the extent that it directs both sides to answer interrogatories immediately. I dissent from the half-hearted approval of the Party's refusal to supply certain critical information and from any implication that the district court may not now order all past officers of the Black Panther Party to answer all interrogatories to the full extent of their knowledge.[2] Thus, while I concur in the remand, I would not permit further delay in discovery on the grounds claimed by the Party.

## I. REQUIRING PARTY OFFICERS TO RESPOND INDIVIDUALLY

My principal disagreement with the majority opinion is over its decision that past and present individual *Party officers* can not *now* be ordered to respond to interrogatories, particularly about acts in which they

might have personally participated and have personal knowledge. In my judgment the district court did not abuse its discretion when it ordered these individuals to respond under oath to certain interrogatories—particularly those that the designated representative of the Party had refused to fairly or fully answer on the grounds that she lacked the information, that she did not know where the information could be obtained, that she was not aware of any such information, that she did not know of any documents containing the requested information, or that the information had been lost or destroyed.[3]

In my view the district court has an inherent power to supervise the discovery process and need not justify every exercise of its supervisory power by resort to some specific provision of the Federal Rules of Civil Procedure. The question instead should be whether the court acted reasonably under the circumstances and not contrary to some specific provision of the Rules.[4] The district court here, in ordering Party officers to answer defendants' interrogatories individually after the Party's representative submitted woefully inadequate responses, acted well within its discretion, and in accordance with the Federal Rules.

---

**2.** Although the district court ordered only Party officers to respond individually, it would also be reasonable, in my view, to require individual responses from authorized Party spokesmen.

**3.** See generally Appendix at end of this opinion.

**4.** As the majority notes in response, the Federal Rules in some instances provide clearly delineated procedures addressed to particular matters in the discovery process. Maj. op. at note 103. It is true that with respect to these matters the Rule in question preempts any inherent authority and analysis of the court's power to act depends exclusively on interpretation of the Rule. *Societe Internationale v. Rogers*, 357 U.S. 197, 207, 78 S.Ct. 1087, 1093, 2 L.Ed.2d 1255 (1958) (court's authority to dismiss complaint for failure to comply with production order depends exclusively on interpretation of Rule 37(b)(2), which specifies the steps a district court may take if any party refuses to obey a production order). The ra-

tionale of *Societe Internationale*, however, is inapposite here, for, as explained in text, none of the rules cited by the majority speaks with any particularity to the court's power to fashion an order compelling discovery. *Independent Productions Corp. v. Loew's Incorp.*, 283 F.2d 730, 732–33 (2d Cir. 1960), also involving Rule 37, is distinguishable for the same reason. Moreover, in *Loew's* the Second Circuit held the district court ignored specific provisions of Rule 37(a) and (b) by dismissing the suit in advance of a failure to obey a Rule 37(a) order.

Obviously the district court lacks power to act contrary to the rules. What I maintain is simply that *absent specific guidance* the district court has power to act reasonably. This does not render the rules "superfluous"; it merely recognizes that in some areas the Rules do not provide specific guidance and that in these areas the district court has power to advance the Rules' general policies favoring fairness and expedition.

The majority is correct in stating that Rule 33 entitles an associational litigant at a certain stage to select an agent to prepare responses to interrogatories. To the extent Rule 33 confers this right, however, it is a right only against the *adverse party*, not against the *court*. That is, even if the *opposing party* may not insist upon responses from specific officers or agents, *Holland v. Minneapolis Honeywell Regulator Co.*, 28 F.R.D. 595 (D.D.C.1961), the *court*, under the appropriate circumstances, may so order.

Rule 37(a) provides that if a party fails to answer an interrogatory submitted under Rule 33, the party seeking discovery may move for an order compelling an answer. The rule does not limit what the order may provide. The common sense of the matter is that if the designated representative of a litigating party proves unable to produce information from the association's officers and records, the court's order may compel officers, or other knowledgable individuals, to answer individually, if the circumstances warrant.

In my view the majority errs when it maintains, Maj. op. at 1254–1255, that the district court has power to order individual responses, if at all, only under Rule 37(b). Subsection (b) of Rule 37 has nothing to do with the district court's power to compel an answer. Rule 37(b) specifies the *sanctions* available to the court if a Rule 37(a) order compelling an answer is disobeyed. It is with regard to *sanctions* that Rule 37(b) recognizes the district court's power to "make such orders as are just." Cf. Maj. op. at 1258 n.99. Requiring responses from designated individuals is not a sanction; it is simply one means of effectuating an order to compel answers. It is subsection (a) of Rule 37 rather than subsection (b) that speaks to orders compelling answers, and it does not restrict the district court's discretion in placing such conditions in its order to compel an answer as will make that order effective. That includes the direction that association officers answer the interrogatories individually. Rule 33(a), as noted, does not restrict the district court's discretion in that regard, either, for Rule 33(a) gives the association the right to select its representative only at the outset, against the attempt of the opposing party to insist on making that selection initially. If the court properly finds that the first set of responses were inadequate, and further properly finds that individual responses are necessary to remedy the deficiency, a Rule 37(a) order to compel individual responses to interrogatories is perfectly valid.

It remains, then, to inquire into the specific circumstances that led the district court to compel individual responses in this case. First, it is obvious from the record and the responses that were made to the defendant's initial interrogatories by Joan Kelley, the Party's designated surrogate for that purpose, that she was unable to furnish much of the information called for by the interrogatories. She did not have first hand knowledge of much of the information concerning the Party that she was requested and selected to furnish. She did not join the Party until 1969, after it had allegedly engaged in 1967 in many of the violent acts of the kind which caused the formation of COINTELPRO, and she did not become a member of the Party's Central Committee until 1971 (JA 730–732). The inadequacy of Kelley as a surrogate for the Party was also made plain by her disingenuous responses to some of the critical interrogatories inquiring about illegal acts: she responded that the Party has no record of any such activity. See Responses to Interrogatories 79, 80, 88, 89, 91, 101, 102, 103, 104 in the Appendix to this opinion. Law breakers rarely go out of their way to document their crimes, but Party officers and others in authority undoubtedly have firsthand knowledge of such acts, if they did take place. As the district court noted, records were scarce, much time had elapsed since the alleged occurrences, witnesses were scattered, and "defendants [were] forced to rely on memories." App. 852. Moreover, Kelley reported that some people she contacted in preparing her responses would not "talk about their former connection with the Party." App. 731.

An explanation for this reticence may be found in the testimony of Party co-founder

and officer Huey Newton (also a plaintiff herein), who revealed that "when any conversation transpires between a Party member and myself it's already understood that nothing will be told unless I give instruction." App. 815. Newton also testified that it is against Party policy to disclose the whereabouts of a Party member accused of a crime. *Id.* In light of all these circumstances it is clear that the district court reasonably determined that the full factual disclosure contemplated by the rules of discovery would come about expeditiously only if all the former Party officers and authorized representatives were required to respond individually to the specified interrogatories. *See generally* Fed.R.Civ.P. 1 ("These rules . . . shall be construed to secure the just, speedy, and inexpensive determination of every action.")

## II. THE CLAIM OF FIRST AMENDMENT PRIVILEGE AS TO INFORMATION CONCERNING UNDISCLOSED PARTY OFFICERS AND AUTHORIZED SPOKESMEN

I also dissent to the extent that the majority holds that the district court violated the Party's First Amendment privileges in ordering disclosure of the names of all undisclosed Party officers and local party leaders. I agree that the names of ordinary members need not be disclosed, absent a showing of a special need with respect to the knowledge of particular individuals, but Party officers and authorized spokesmen are in a different category. As to these undisclosed individuals, the defendants' need for the information in their possession outweighs the Party's claim of constitutional privilege. The district court balanced the appropriate factors, albeit not as explicitly as some might desire, and arrived at the correct result. Its order to compel responses was in this respect valid, even if dismissal was too severe a sanction for flouting it.

As the majority relates, determining whether discovery can be compelled over a claim of constitutional privilege requires an assessment of the substantiality of the claim of privilege, the relevance of the information sought, and the availability of alternative sources. I question, at the outset, whether the district court's order compelling discovery should not be upheld simply on the basis that the Party failed to make a substantial showing of privilege. In fact, the Party made no showing at all. It "*claims* that [its associational] freedoms [under the First Amendment] might be endangered if the names of its leaders . . . not known to the public are disclosed," Maj. op. at note 153, and "*alleges* that its members have been harassed before, and suggests this harassment may continue." *Id.* (emphasis added). Of course, if they are breaking the law, some legitimate acts of law enforcement that they characterize as "harassment" may be justified. Yet, despite its opportunities to do so, the Party has made no evidentiary showing to rebut the defendants' explanation that investigation of the Party ceased years ago. This case is thus a far cry from *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), in which an "uncontroverted showing" of past reprisals against persons disclosed to be affiliated with the NAACP permitted the Supreme Court to conclude that compelled disclosure of the NAACP's membership in Alabama would have unwarranted adverse consequences for the individuals involved. *Id.* at 462–63, 78 S.Ct. at 1171–1172.

*NAACP v. Alabama* is also distinguishable on other grounds. Justice Harlan's opinion upheld the First Amendment right of the NAACP to refuse to disclose the names of its *general rank and file members* in Alabama to state authorities who were resisting the civil rights campaign by the NAACP in that state. And the civil rights campaign was legal. What is critical in the *Alabama* decision to this case is that while the NAACP withheld the names, it *furnished* the "total number" of its ordinary members in Alabama. It also furnished "*the names of all its directors and officers.*" 357 U.S. 465, 78 S.Ct. at 1173. *NAACP* is thus *not* authority for the Black Panthers withholding names of the Party's officers and authorized spokesmen.

Moreover, the *names* of the NAACP's ordinary members had little or no relevance to the lawsuit brought by Alabama against the NAACP; that suit was brought merely because the NAACP had failed to register as a foreign corporation. The NAACP furnished evidence of its finances in the state and admitted that it had many members in the state. Discovering the *names* of the ordinary members would not have added to the proof that the NAACP was doing business in the state. Justice Harlan's opinion, in distinguishing the case of *Bryant v. Zimmerman*, 278 U.S. 63, 49 S.Ct. 61, 73 L.Ed. 184 (1928), implicitly acknowledged that the names of persons in an organization may sometimes be highly relevant to a lawsuit. In *Zimmerman* the Supreme Court upheld a New York statute that required the Ku Klux Klan in that state to produce its "roster of membership and list of officers for the current year." The New York statute applied to unincorporated associations that required an oath as a condition of membership. In *NAACP*, the Court distinguished *Zimmerman*, indicating that the New York statute was evidently meant to regulate an organization notorious for its "acts of *unlawful* intimidation and violence" (emphasis added), whereas the discovery of names sought by the state under the Alabama statute at issue in *NAACP* would infringe deeply upon the right of NAACP members freely to "pursue their *lawful* private interests." 357 U.S. at 465, 466, 78 S.Ct. at 1173 (emphasis added).

According to the allegations, this case is much closer to *Zimmerman* than to *NAACP*. Plaintiffs' pleadings contend that the Black Panther Party was at all times practically an eleemosynary organization devoted to good works among the poor and needy and was greatly wronged by the acts of defendants. On the other hand, the defendants, judging from their interrogatories and statutory responsibilities, are contending that the Black Panther Party, during the years in question, was engaged, among other crimes, in a conspiracy to

cause civil disorder in violation of 18 U.S.C. § 231(a), 18 U.S.C. § 371, by unlawful intimidation, force, violence, terrorist activities and inducements to kidnapping, murder and interference with law enforcement officers in the lawful performance of their official duties. For example, see Interrogatories 80 (storing guns and military equipment); 81 (encouraging mutiny in armed forces and killing of Army officers); 89 (killing police officers); 91 (killing president and ex-president); 101 (acquiring and stealing dynamite, bombing of public buildings, etc.); 102 (using explosives); 103 (hijacking airplanes); 104 (ambushing police officers). These and other interrogatories indicate it is part of the defendants' defense that, in accordance with their statutory duties to enforce federal laws and to prevent crimes against the United States, they were engaged in a legitimate effort to investigate the Black Panther Party to discover those violating the laws of the United States, to destroy the unlawful conspiracy, and to prevent such illegal activities in the future.[5]

Plaintiffs also contend that *Carey v. Hume*, 492 F.2d 631 (D.C.Cir.), *petition for cert. dismissed*, 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974), supports their claim of a First Amendment privilege to withhold the names of secret officers and spokesmen. However, as we noted in *International Union v. National Right to Work*, 590 F.2d 1139 (D.C.Cir.1978), our ruling in *Carey v. Hume* recognized that the First Amendment interests implicated by compelled disclosure of the confidential source of a newsman may sometimes be outweighed by a civil litigant's need for information in a lawsuit. The Party's First Amendment claim is similarly outweighed here.

The preconditions for compelling disclosure established in *Carey* were simply that the party seeking disclosure has made reasonable attempts to obtain the information elsewhere, and that the information sought goes to the heart of the lawsuit, 492 F.2d at 636–39 and cases cited. These require-

---

5. Defendants have not specified the crimes they were investigating. 18 U.S.C. § 231(a) and § 371 seem obviously involved, however, from the information sought by the interrogatories.

ments have been satisfied here. The attempts to obtain the information from the Party itself were unavailing, justifying direct recourse to the Party's officers and authorized spokesmen. It is also clear that the interrogatories seek information that is critical to defendants' apparent contention that their conduct was justified by the nature of the Black Panther Party as an unlawful conspiracy engaged in numerous violations of federal law. At this late stage in the pre-trial proceedings, since the vital information concerning the Party's activities has been withheld or claimed to be unavailable, the time is ripe to require the Party's officers and authorized spokesmen, including those not publicly known, to respond to defendant's interrogatories. In fact, the officers and authorized spokesmen who have not been publicly disclosed might well be the persons best able to reveal the facts of the operation of the alleged conspiracy.

Nor does our *Right to Work* decision, *supra*, support the Party's insistence on secrecy. In that case we held that the district court had acted prematurely in ordering the Right to Work Foundation to disclose the names of its contributors, but the identity of the companies whose officers or employees were members of the Foundation's Right to Work Advisory Council had already been publicly disclosed. 590 F.2d at 1145. Those council members are the equivalent of the officers and spokesmen of the Black Panther Party. *Right to Work* thus recognized no First Amendment right in concealing the identity of an organization's officers and spokesmen. Moreover, we recognized in *Right to Work* that

> At some point, the additional burden on a litigant in seeking out alternative sources of discovery may justify compelling disclosure of essential information from one asserting a constitutional privilege.

*Id.* at 1153. The government's evident prejudice from yet further delay justifies disclosure now. Thus, in my view, *Right to Work*, far from justifying continuing concealment, is additional authority for compelled disclosure.

The Black Panther Party filed a further response on October 2, 1979, to 107 interrogatories as ordered by the Court on August 6, 1979. However, the Party still continued to claim that it had a First Amendment privilege to refuse to disclose the identities of certain Central Committee members, local leaders and certain individual party members who were not already publicly known. The Party stated its position as follows:

> The Party, and its officers, continue to object to the disclosure of information for which the Party has claimed a First Amendment privilege. Specifically, the Party continues to refuse to disclose the identities of Central Committee members whose names have not been previously disclosed (interrogatory 21); the identities of local leaders of the Party's affiliates (interrogatory 33); and the names of individual party members not already publicly known which were deleted from the weekly reports from Party affiliates which were provided to defendants (interrogatory 61).

(JA at 874). As stated above the plaintiffs have no First Amendment privilege to refuse to disclose the identity of Central Committee members or local leaders. Whether the privilege extends to individual party members will depend on the prominence of the Party member, his authority and upon his Party activities. There is no general right to compel responses from "individual party members," but if a showing were made that individual members were in possession of relevant knowledge they could be compelled to answer interrogatories or to testify by deposition. It must not be forgotten that the suit is brought for the members in the name of their Party.

## III. THE CLAIM OF A FIFTH AMENDMENT SELF-INCRIMINATION PRIVILEGE BY PLAINTIFF HUEY P. NEWTON

Plaintiff Huey P. Newton was co-founder of the Black Panther Party. Throughout the early violent period in the Party's activities he exercised a controlling position in the activities of the Party and its members,

and, according to his testimony, controlled the disclosure of information concerning the Party, even if it concerned a crime.[6]

On August 6, 1979 the district court ordered Newton to answer 37 interrogatories over his claim that the answers thereto would implicate his Fifth Amendment privilege against self-incrimination. (JA 856–57.)[7] He still claims this privilege with respect to 30 interrogatories. (JA 991.)[8] For the future, it should be noted that Newton as an official of the Black Panther Party cannot assert his personal privilege to resist production of documents of the association in his custody which might incriminate him personally. *United States v. White*, 322 U.S. 694, 699–700, 64 S.Ct. 1248, 1251, 88 L.Ed. 1542 (1944); *Wilson v. United States*, 221 U.S. 361, 384–385, 31 S.Ct. 538, 545–546, 55 L.Ed. 771 (1911). *Cf. George Campbell Painting Corp. v. Reid*, 392 U.S. 286, 88 S.Ct. 1978, 20 L.Ed.2d 1094 (1968). Thus Newton might not be able to claim any personal privilege with respect to those interrogatories that call for the production of association documents. See Interrogatories Nos. 91, 92, 99, 101, 102, 103, 104.

In a great many instances, where the testimony is relevant, courts at the pretrial discovery stage have dismissed civil lawsuits with prejudice when a plaintiff claims the Fifth Amendment[9] privilege against self-incrimination and thereby denies the civil defendant use of the incriminating testimony. The rationale relied upon by the courts in such cases has not been uniform. In *Lyons v. Johnson*, 415 F.2d 540 (9th Cir. 1979) the court after several preliminary comments ruled that in any event the Fifth Amendment could not be used to block *all* discovery. The court in *Tomko v. Lees*, 24 Fed.R.Serv.2d 407 (W.D.Pa.1977) denied a claim of self-incrimination by a plaintiff who sued police under 42 U.S.C. § 1985 for a threat to arrest him unless he turned informer and then sought the Fifth Amendment privilege against testifying to his involvement in the criminal activity for which arrest was threatened. The court refused to permit such claim, noting

> It would be uneven justice to permit plaintiffs to invoke the [court's] powers [to seek redress] and, at the same time, permit plaintiffs to fend off questions, the answers to which may constitute a valid defense or materially aid the defense.

(quoting *Independent Productions Corp. v. Loew's, Inc.*, 22 F.R.D. at 276). In an earlier case in the Eastern District of Pennsylvania involving a claim of privilege against self-incrimination the court cited *Lyons v.*

---

**6.** The Government Statement to Compel Responses to Interrogatories (JA 775–816) recites a portion of Newton's testimony as follows:

[I]t has been a Party policy since 1966 that '... when any conversation transpires between a Party member and myself its already understood that nothing will be told unless I give instruction,' even if it concerns a crime.[9] [Transcript, page 146.]

[9] Newton also testified it is against Party policy to reveal the whereabouts of a Party member accused of a crime. [Transcript, page 82.] This testimony concerned Robert Heard, one of the 'publicly-disclosed' members of the Central Committee and a prospective witness, who also is a fugitive. His status as a fugitive and the existence of the Party's policy obviously makes fruitless [the] suggestion that defendants should attempt to interview such members before receiving further answers. (JA 815 & n.9).

**7.** The designated interrogatories were: 11–15, 17–41, 43–45, 49, 51, 64, 74. (JA 857).

**8.** Interrogatories 17, 21, 26, 37, 51, 64 and 74 have been answered (JA 991).

**9.** The Fifth Amendment provides "no person ... shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law...." The privilege has been held to extend to civil proceedings. *McCarthy v. Arndstein*, 266 U.S. 34, 45 S.Ct. 16, 69 L.Ed. 158 (1924) (examination of a petitioner in bankruptcy); and to a non-criminal disciplinary hearing of a prison inmate. *Baxter v. Palmigiano*, 425 U.S. 308, 316, 96 S.Ct. 1551, 1557, 48 L.Ed.2d 1 (1976). However, the privilege may be found in effect to have been waived where the party answers some preliminary questions but desires to stop at a certain point. *Rogers v. United States*, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951); *United States v. Monia*, 317 U.S. 424, 63 S.Ct. 409, 87 L.Ed. 376 (1943).

*Johnson, supra,* and reasoned that since the plaintiff was a voluntary litigant he could not refuse to answer 50 questions. *Penn Communications Specialties, Inc. v. Hess,* 65 F.R.D. 510, 511 (E.D.Pa.1975). Judge Neville's decision in *Brown v. Ames,* 346 F.Supp. 1176–1178 (D.Minn.1972) was also relied upon. That was a false arrest suit by plaintiffs who refused to answer any deposition questions relating to any conversations or conduct on the day of the arrest. Finding that the answers to the questions could lead to the discovery of relevant evidence of probable cause to make the arrests, the court ruled that the plaintiffs must testify or suffer their action to be dismissed. It is the prejudice to the defendant that overrides the privilege.

An antitrust action in the Southern District of New York reached the same conclusion. Therein the court ruled that since the witness was the sole stockholder and prime mover of the corporation plaintiffs, his refusal to testify about his Communist Party connections, which testimony was relevant and material to the specific defense of the defendant, amounted to a refusal by the plaintiff corporation and constituted a waiver of its privilege to bring the action. *Independent Productions, Inc. v. Loew's, Inc.,* 22 F.R.D. 266, 277–78 (S.D.N.Y.1958).

Several courts have also characterized their rulings as prohibiting a plaintiff from using the privilege against self-incrimination as both a sword and a shield:

> Plain justice dictates the view that, regardless of plaintiff's intention, plaintiffs must be deemed to have waived their assumed privilege by bringing this action. Moore, Federal Rules and Official Forms, 164 (1956).

 \* \* \* \* \* \*

This view strikes home. Plaintiffs in this civil action have initiated the action and forced defendants into court. If plaintiffs had not brought the action, they would not have been called on to testify. Even now, plaintiffs need not testify if they discontinue the action. They have freedom and reasonable choice of action. They cannot use this asserted privilege as both a sword and a shield. Defendants ought not be denied a possible defense because plaintiffs seek to invoke an alleged privilege.

*Id.* at 276, 277, *quoted in Bramble v. Kleindienst,* 357 F.Supp. 1028 (D.Colo.1973).

The opinion in *Christenson v. Christenson,* 281 Minn. 507, 162 N.W.2d 194 (1968) by Justice Nelson aptly poses the question and supplies the answer.

> The question is rather whether plaintiff should be permitted to withhold information [under a claim of self-incrimination] which must relieve defendant of liability and at the same time be permitted to prosecute her claim. The risk that plaintiff might thereby succeed in an unmeritorious claim would seem to be so substantial that she must either divulge the information or abandon her claim.

162 N.W.2d at 202.

The New York Court of Appeals in *Laverne v. Incorp. Village of Laurel Hollow,* 18 N.Y.2d 635, 272 N.Y.S.2d 780, 219 N.E.2d 294 (1966), also relied upon this rationale.

> The privilege against self-incrimination was intended to be used solely as a shield, and thus a plaintiff cannot use it as a sword to harass a defendant and to effectively thwart any attempt by defendant as a pretrial discovery proceeding to obtain information relevant to the cause of action alleged, and possible defenses thereto. (See, also, *Franklin v. Franklin,* 365 Mo. 442, 283 S.W.2d 483; *Hazlett v. Bullis,* 12 A.D.2d 784, 209 N.Y.S.2d 601 [2 Dept 1961]).

Judge Doyle in the Western District of Wisconsin reasoned similarly in *Kisting v. Westchester Fire Ins. Co.,* 290 F.Supp. 141–49 (W.D.Wis.1968). This was a civil action on a fire insurance policy where the insurance company alleged arson by the insured as an affirmative defense.

> Plaintiff's next contention is that the privilege against self-incrimination justifies Kisting's refusal to answer the questions involved. Plaintiffs thus seek to utilize the privilege not only as a shield, but also as a sword. This they cannot do.

A plaintiff in a civil action who exercises his privilege against self-incrimination to refuse to answer questions pertinent to the issues involved will have his complaint dismissed upon timely motion. See *Stockham v. Stockham*, 168 So.2d 320, 4 A.L.R.3d 539 (Fla.1964); *Lund v. Lund*, 161 So.2d 873 (Fla.App.1964); *Levine v. Bornstein*, 13 Misc.2d 161, 174 N.Y.S.2d 574 (S.Ct., Kings Co. 1958); aff'd 7 A.D.2d 995, 183 N.Y.S.2d 868 (2d Dept.), aff'd 6 N.Y.2d 892, 190 N.Y.S.2d 702, 160 N.E.2d 921 (1959); *Franklin v. Franklin*, 365 Mo. 442, 283 S.W.2d 483 (1955); Annot., 4 A.L.R.3d 545. Cf. *Zaczek v. Zaczek*, 20 A.D.2d 902, 249 N.Y.S.2d 490 (2d Dept. 1964)

290 F.Supp. at 149.[10]

In an analogous situation the Supreme Court in a denaturalization proceeding ruled that when the subject of the action took the stand and testified in her own behalf she waived the right to invoke on cross examination the privilege against self-incrimination regarding matters made relevant by her testimony on direct examination. *Brown v. United States*, 356 U.S. 148, 154–56, 78 S.Ct. 622, 626–627, 2 L.Ed.2d 589 (1958).

Three recent cases discuss other factors. The Fifth Circuit in *Wehling v. CBS*, 608 F.2d 1084 (5th Cir. 1979), ruled that plaintiffs during discovery should have been allowed *temporarily* to claim the Fifth Amendment privilege without suffering immediate dismissal of their action. It based such decision on the conclusion that the dismissal was unwarranted absent an inquiry as to whether deferring the plaintiffs' action would allow the applicable statutes of limitation to lapse without prejudice to the defendant. In Newton's case, as explained elsewhere, further delay will prejudice defendants and expiration of the statutes of limitations might never occur. Even if the statute might run as to some offenses, the defendant's absence from the relevant jurisdiction might have tolled the

running of the statute for such a long period of time as to cause an unreasonable delay in obtaining vital evidence.

The second case is *Campbell v. Gerrans*, 592 F.2d 1054 (9th Cir. 1979) where a Fifth Amendment claim of privilege was upheld against "highly questionable" interrogatories which were considered to be harassing and as not going to the heart of the defense. The interrogatories here go to the very heart of the defendants' defenses and do not constitute harassment.

Finally, the Sixth Circuit in *United States v. U. S. Currency*, 626 F.2d 11, 14–15 (6th Cir. 1980), suggested that the district court should consider three alternatives: (1) rely on alternative sources for the information that a litigant seeks to protect with his claim of Fifth Amendment privilege; (2) grant the litigant immunity as to his testimony; (3) stay the proceedings until criminal proceedings and statutes of limitation have run their course. It is not practicable in this case to apply any of these alternatives. Newton and the other officers have exclusive knowledge of some of the facts because they were involved personally. As to the second suggestion, it would be unthinkable to grant plaintiffs immunity from prosecution on the crimes alleged against them in the congressional hearings. See, H.Rep.No.92–470, 92d Cong., 1st Sess. (1971). The magnitude and number of the alleged offenses compel prosecution, not immunity, particularly with respect to Newton and he is the principal subject that we are considering here. It would be a gross miscarriage of the judicial process to permit an alleged criminal to obtain immunity from prosecution as a result of his bringing a civil suit for damages against the officials charged with his prosecution. Such law would breed many civil suits. And granting more limited immunity, considering the breadth of the alleged criminal activities, could lead to endless litigation.

As for allowing the statute of limitations to run, as suggested above, that would be of

---

**10.** *Foss v. Gerstein*, 58 F.R.D. 627 (S.D.Fla. 1973); and *Alioto v. Holtzman*, 320 F.Supp. 256 (E.D.Wis.1970), which are frequently cited as being *contra*, are substantially distinguishable on their facts.

doubtful practicality inasmuch as they do not run for crimes of murder and aiding and abetting murder, and these crimes may be involved. For example, see S.Rep.No. 94–755, Book III, 190 (1976). House Hearings, Committee on Internal Security, 91st Cong., 2d Sess. 217, 229 (1970). Also, the absence of a putative defendant from the jurisdiction tolls the running of the statute of limitations. The federal statutes of limitations do not run while one is a fugitive from justice. 18 U.S.C. § 3290.[11] *See Jhirad v. Ferrandina*, 486 F.2d 442 (2d Cir. 1973). For state offenses, see 22 C.J.S. *Criminal Law* § 230. It is a matter of general public knowledge that Newton was outside the United States for a number of years. This would extend the expiration of the time fixed by the statute for a very considerable period of time and would cause a further loss of testimony for all the reasons that lapse of time causes an attrition in evidence, i. e., loss of memory, death, inability to locate witnesses, destruction and loss of documents, etc.

In sum, while filing a lawsuit may not automatically waive one's privilege against self-incrimination, the plaintiff in a civil suit does not have an absolute privilege for all time. In this case that time has passed since defendants would be greatly prejudiced by further delay in obtaining relevant testimony. The defendants have a constitutional due process right to all relevant testimony and that right must now be recognized. *See generally Garner v. United States*, 424 U.S. 648, 655, 96 S.Ct. 1178, 1182, 47 L.Ed.2d 370 (1976).

I thus respectfully dissent to the extent of the variation between the foregoing views and those expressed in Judge Wright's opinion. The strength of that opinion is minimized by its failure to respond to the First and Fifth Amendment discussion set out above. In any event the eventual outcome of the discovery in this case must follow the principles set forth above if plaintiffs persist in their recalcitrant conduct.

11. 18 U.S.C. § 3290 provides: "No statute of limitations shall extend to any person fleeing from justice."

## APPENDIX

There follows a sampling of the interrogatories and responses that indicate the Party representative failed to answer adequately. The comments that follow the responses point out the inadequacies of the responses and indicate why the officers and authorized spokesmen of the Party should now be required to respond to each of these interrogatories. In my judgment, the comments are not altered by the subsequent responses that the Party made to some interrogatories.

*Interrogatory 25:*

Identify all officers and other persons who were or now are authorized to speak on behalf of the Black Panther Party.

Response:

The scope of the interrogatory certainly makes it excessively burdensome and, therefore, objectionable. It is impossible for the Party to identify everyone who has been authorized to speak for the Party, an organization that has been in existence for twelve years, and had affiliates in over 40 cities throughout the United States at various times. Party members could have been authorized to speak on one or numerous occasions. At various times, numerous persons have been authorized to speak on a broad range of issues and policies; others only to a specific audience or group, in response to a specific request or need to do so. The Party has not maintained a listing of these persons. However, we can state, that members of the Central Committee are generally authorized to speak on behalf of the Party, although there have been exceptions to this proposition. The following is a representative listing of leading Party members and the approximate periods for which such an authorization existed:

a) Huey P. Newton . . . . . . . 1966 to the present
b) Bobby Seale . . . . . . . . . . 1966 to 1974
c) Elaine Brown . . . . . . . . . 1971 to 1977
d) Ericka Huggins . . . . . . . . 1972 to the present
e) David DuBois . . . . . . . . . 1972 to the present
f) David Hilliard . . . . . . . . . 1969 to 1974
g) Eldridge Cleaver . . . . . . . 1967 to 1971

This information is central to the defendants' defense. The defendants presumably are defending their acts with respect to the Black Panther Party and they are clearly entitled to the names of all officers and other persons who were authorized to act and speak for the Black Panther Party. The party is responsible for their actions and if such are shown to be criminal the acts of the defendants may be fully justified. In this respect the defendants are entitled to information concerning the acts and authority of the various officers and members of the party, particularly so, because in a conspiracy the acts of co-conspirators within the scope of the conspiracy can be imputed to others in the conspiracy.

*Interrogatory 30:*

Describe in detail the nature of the affiliation between the Black Panther Party of Oakland, California, and each affiliate identified in answer to interrogatory 26.

*Response:*

Each "affiliate" which was listed as a Black Panther Party office or center functioned as a local office of a single entity. Each affiliate provided those social services as needed by the Black and poor communities of the area in which it was located. These affiliates subscribed to the principles and theories of government outlined in the 10 Point Program and Platform of the Black Panther Party, the Party's basic operating guide.

(App. 107).

This is another interrogatory that would have special reference to discovery of facts concerning the extent of a conspiracy. Each of the officers of the Party should be required to respond to this inquiry because the Party had far-flung operations that might be better testified to by the numerous Party officers and spokesmen throughout the country.

*Interrogatory 32:*

For each affiliate identified in answer to interrogatory 26, identify all present and former offices, posts and other positions of responsibility of the affiliate.

*Response:*

Each local affiliate had a local "central staff" which was composed of the members in the area who supervised and coordinated the activities and services of that area. See the response to Interrogatory 18 for more details in the central staff's functions.

(App. 108).

This response is woefully inadequate. It fails to name names. The Party officers should be required to identify "present and former officers" to the extent of their ability.

*Interrogatory 33:*

For each office, post and position of responsibility identified in answer to the preceding interrogatory, identify each person who has held or holds the office, post or position of responsibility and the dates of their respective terms of office.

*Response:*

Plaintiff objects that this request is unduly burdensome. A central file of such information does not exist and this information, to the extent that it is available at all, must be obtained from issues of the Black Panther Party newspaper which is publicly available. Reconstruction of such names for a period of ten years and for over forty cities is impossible from the records kept by plaintiff.

(App. 108). The Party officers were undoubtedly in possession of such information and to the extent that they still recall it they should be required to disclose it rather than permit the party to completely hide behind the claim that the question is "unduly burdensome." It may also prove to be unduly incriminating and hence essential to the defense.

*Interrogatory 46:*

Identify all chapters which continued to function after the revocation of their chapter by the national organization and state whether such former chapters currently are functioning.

*Response:*

Plaintiff does not have information on this subject.

(App. 115). The Party officers and spokesmen would undoubtedly have some of this information and to the extent that they still recall it they may be required to disclose it. Such information could produce invaluable leads to Party activities that are highly relevant to the defense.

*Interrogatory 47:*

For each affiliate identified in answer to interrogatory 41, state whether the property and business or other offices either now or formerly occupied by the affiliates was owned or leased by the national organization.

*Response:*

Plaintiff does not have records or information on these properties.

(App. 115).

The officers and spokesmen should have a recollection of this information. It would disclose material evidence as to the relationship between the Party and its affiliates for whose acts the Party must be held responsible.

*Interrogatory 48:*

For each affiliate's property or office where the answer to the preceding interrogatory was negative, was the property owned or leased by Stronghold Consolidated Productions, Inc.?

*Response:*

See responses to Interrogatories 46 and 47.

(App. 115).

Some of the Party officers and spokesmen should recall whether the property was owned or leased by Stronghold Consolidated Functions, Inc. and they may be required to furnish this information.

*Interrogatory 51:*

Identify all documents which reflect criticism from the national organization to any Black Panther Party affiliate as a result of the affiliate's lack of militancy, aggressiveness, or failure to confront police or other officials.

*Response:*

Plaintiff does not have knowledge of any such documents.

(App. 116).

Even if the plaintiff does not have knowledge of any such documents the question goes directly to the direction and control of the national organization and as to the type of organization that was being conducted. The officers who ran the Party and its spokesmen should have detailed information about this and they may be required to disclose it to the extent that it is within their knowledge.

*Interrogatory 54:*

Identify (by docket number, court, and parties) all civil and criminal actions (Federal and State) in which the Black Panther Party, its officers and members, or any Party affiliate was a party, other than actions involving marital, child support, or personal debt issues.

(App. 117). The party's response was lengthy and is not repeated. It stated that this interrogatory was overly burdensome and that court records are as available to the defendants as to the plaintiffs. Claim was also made that the defendants had extensive records regarding criminal actions, and three actions were specifically referred to. However, as to any *other information* known to the Party officers and spokesmen, they may be required to disclose it. While the defendants might know about some criminal actions involving the Party, they may not know that some criminal prosecutions that have been brought involve members of the Black Panther Party—particularly since the Party has indicated that it has some secret officers and members. Undisclosed crimes then may extend beyond those that the government was able to discover previously. Consequently, to the extent that Party officers and authorized spokesmen have such information, they may be required to disclose it.

*Interrogatory 58:*

Describe in detail the purposes, aims, goals, and actions of The Emergency Conference to Defend the Right of the Black Panther Party to Exist held on or about March 7–8, 1970, in Chicago, Illinois.

*Response:*

Plaintiff has no knowledge or documents with regard to this Conference which was not held or sponsored by the Party.

(App. 119–120).

Since the Party has claimed it has "no knowledge or documents with regard to this conference" which was allegedly not held or sponsored by the Party, if any of the officers or spokesmen have any information in connection with it, they may be required to disclose it.

*Interrogatory 59:*

Identify all other Conferences, ad hoc organizations, programs, and conventions (by title, date, and location) with purposes, aims, goals, and actions similar to the Chicago conference referenced in the preceding interrogatory.

*Response:*

Plaintiff has no knowledge or documents with regard to such conferences, organizations, programs or conventions and none were held or sponsored by the Party.

*Interrogatory 60:*

Identify all documents distributed at or generated as a result of the Chicago conference and the conferences, ad hoc organizations, programs, and conventions identified in answer to the preceding interrogatory which discuss, mention, or in any way refer to nation-wide harrassment of repression against the Party.

*Response:*

See responses to Interrogatories 58 and 59.

(App. 120).

Since the Party claims not to have any information concerning these matters it is proper to ask the Party officers and former spokesmen to respond to such interrogatories to the extent of their ability.

*Interrogatory 67:*

With regard to those documents identified in answer to interrogatories 62 and 63 which are not retained by the national office, identify which persons or organization (including affiliates) might have the documents.

*Response:*

Plaintiffs are not aware of any other organization or affiliate that might be in possession of these documents with the exception of the defendants.

(App. 122–123). Since the Party claims it is not able to furnish this information it is perfectly proper to ask those who controlled of the party and directed its operation to furnish such information as they may have in connection therewith.

*Interrogatory 70:*

Provide the present address of Bobby Seale.

*Response:*

Plaintiff does not have the present address of Bobby Seale.

(App. 123).

Since the plaintiff claims not to have this information it is perfectly proper to make the Party officers respond to this inquiry. They well might know the present address of the named individual. A recent newspaper story reported he was in Seattle.

*Interrogatory 72:*

Did Party members ever give the Party, or its officers, a percentage of moneys and/or goods which had been taken without an exchange of consideration?

*Response:*

No.

(App. 124).

This interrogatory is aimed directly at Party "officers" and to transactions between them and the Party. It requests information that the officers are peculiarly equipped to supply if any exists. Each Party officer may be required to respond to this interrogatory.

*Interrogatory 73:*

Identify all documents which reflect the receipt of such a percentage by the Party or its officers, including but not limited to documents which either commend or criticize members in connection with the receipt of such a percentage or the failure to pay a percentage.

*Response:*

There are no such documents. (App. 124).

Same position as the comment to Interrogatory 72.

*Interrogatory 75:*

Were Party members or officers required by any formal or informal rule or encouraged to obtain, carry, and/or train with firearms?

*Response:*

Within the limits of the law and the Constitution, the right to bear arms and defend one's home and property was not discouraged.

(App. 124).

The response of the plaintiff hedges its answer. To the extent that it existed Party officers and spokesmen would have individual knowledge of the information here requested and they should be required to state whether such activity was "required by any formal or informal rule or encouraged." If it was encouraged, they would be the most likely ones to encourage such activity—hence they may have a peculiar ability to respond to this interrogatory.

*Interrogatory 79:*

For each year beginning in 1966, identify which offices of the Black Panther Party or its affiliates have had revolvers, rifles, machine guns, shotguns, other firearms, hand grenades, bazookas, M–79 grenade launchers, dynamite, and/or plastic explosives stored in that office.

*Response:*

Plaintiff has no records or other means of identifying which offices or affiliates, if any, have had such materials stored. (App. 125–126).

This reply is not responsive to the question. The interrogatory seeks information that was directly related to the activities of Party officers and they should be required to respond to the extent of their individual knowledge.

*Interrogatory 80:*

Identify (by make or type, model and, where appropriate, serial number) all revolvers, rifles, machine guns, shotguns, other firearms, hand grenades, bazookas, M–79 grenade launchers, dynamite and plastic explosives which have been stored at any time in an office of the Black Panther Party or any affiliate for each year beginning with 1966.

*Response:*

See response to Interrogatory 79.

(App. 126).

This reply is not responsive and the individual officers and spokesmen may be required to respond thereto. The question is directed at information that is material to determining the character of the organization being investigated and the knowledge of the officers of the activities of the organization is material and relevant.

*Interrogatory 88:*

In addition to the article appearing in the March 21, 1970 issue of "The Black Panther", identify all documents originated by the Party, its officers, or any affiliate which reflect statements, suggestions, orders, or policy that American troops in Vietnam should kill their officers, General Abrams and/or his staff.

*Response:*

No such documents exist. If there was any statement on this general subject it would have appeared in the "Black Panther". However, the article of March 21, 1970, and any other similar article, are rhetorical in the idiom of the Black and poor community and reflect the Party's disagreement with the United States Government's participation in the war in Vietnam.

(App. 128).

The Party's claim that such statements were "rhetorical" is in effect an admission of their existence. Since this information is vital to determining the true character of the Party and inquires specifically as to any acts by "officers," all officers may be required to personally respond to this interrogatory.

*Interrogatory 89:*

Identify all documents originated by the Party, its officers, or any affiliate which reflect statements, suggestions, orders, or policy that members or others should kill police officers.

*Response:*

No such documents exist. While defendants may believe that such documents exist, this again reflects defendants failure to understand that statements of the Party are frequently to be understood rhetorically and not literally.

(App. 128).

The claim that no such documents exist is implicitly contradicted by the statement that defendants do not understand *rhetorical* statements. Thus the Party officers who were directing the activities of the Party may be compelled to respond to the interrogatory.

*Interrogatory 91:*

In addition to the statement by Party Chief of Staff David Hilliard reported in the November 22, 1969 issue of "The Black Panther," identify all documents originated by the Party, its officers, or any affiliate which reflect statements, suggestions, orders, or policy that members or others should kill Richard Nixon, Lyndon Johnson, or other officials of government.

*Response:*

No such documents exist. The November 22, 1969 article and any similar comments are rhetorical indications of our disagreement with the repressive and illegal activities of such government officials. See responses for Interrogatories 88–90.

(App. 129).

Same comment as to Interrogatory 89.

*Interrogatory 101:*

Identify all documents which discuss, refer to, plan, or in any way mention the following:

A) the theft of approximately 1000 pounds of dynamite from Quick Supply in Ankeny, Iowa on or about May 5, 1970;

B) the acquisition, storage, handling, or use of any dynamite, including but not limited to dynamite taken from Quick Supply or 2½" by 16" dynamite, by members of the Omaha, Nebraska or Des Moines, Iowa Chapters or National Committees to Combat Facism;

C) the bombing of the Des Moines, Iowa Police Department on or about May 13, 1970;

D) the bombing of the Ames, Iowa Police Department on or about May 22, 1970;

E) the bombing of the Chamber of Commerce building in Des Moines, Iowa on or about June 13, 1970;

F) the burglary of the Holm gun shop in Des Moines, Iowa on or about June 13, 1970;

G) the placement of an explosive boobytrap device beneath a freeway bridge in Des Moines, Iowa on or about June 21, 1970;

H) the bombing of the Drake University science hall in Des Moines, Iowa on or about June 29, 1970;

I) the bombing of the North Assembly police station in Omaha, Nebraska on or about June 11, 1970;

J) the bombing of Components Concept Corporation in Omaha, Nebraska on or about July 2, 1970;

K) the placement of a boobytrapped toolbox in Des Moines, Iowa on or about August 1, 1970; and/or

L) the killing, by way of boobytrapped suitcase, of police officer Larry Minard at 2867 Ohio Street in Omaha, Nebraska on or about August 17, 1970.

*Response:*

Plaintiff is not aware of any such documents.

(App. 133–134).

Since the awareness of the Party representative is somewhat limited, those with firsthand knowledge going back beyond her time with the Party may be required to respond. If such documents exist, many of the officers might have personally prepared them. The specificity of this interrogatory and Kelley's statement that she is not "aware" of any such documents fully justifies requiring each Party officer to respond to this interrogatory.

*Interrogatory 102:*

Identify all documents which discuss, refer to, plan, or in any way mention the use of explosive devices by Party or Party affiliate members.

*Response:*

Plaintiff has no such documents which plan the use of explosive devices by the Party or affiliates. However, mention of such devices has been made from time to time in various articles printed in the "Black Panther" newspaper.

(App. 134–135).

The response that the plaintiff has no such documents is not a complete answer to the question or the request to "identify all documents." Each officer and spokesman may be required to respond to this inquiry because of the importance of the information and because it well might have been that the officers prepared such documents in the first place and might have an excellent recollection thereof.

*Interrogatory 103:*

Identify all documents which discuss, refer to, plan, or in any way mention hijacking airplanes by Party or Party affiliate members.

*Response:*

Plaintiff has no such documents which plan hijacking airplanes by the Party or affiliates. However, mention of such activity has been made in articles which have appeared in the "Black Panther" newspaper.

(App. 135). The comment made as to Interrogatory 102 is equally applicable here.

*Interrogatory 104:*

Identify all documents which discuss, refer to, plan, or in any way mention ambushes of or gun battles with police or other law enforcement officers by Party or Party affiliate members.

*Response:*

Plaintiff has no such documents except for issues of the "Black Panther" which report on police or other government agency activities against the Party or affiliates.

(App. 135). Same comment as to Interrogatory 102, *supra.*